# 23-0155-cv

# United States Court of Appeals

*for the*

# Second Circuit

---

40 DAYS FOR LIFE, a nonprofit corporation of the State of Texas, WHITE PLAINS 40 DAYS FOR LIFE, as unincorporated association of the State of New York, OKSANA HULINSKY, REGINA CREARY MOLINELLI,

*Plaintiffs-Appellants,*

JANE DOE, SALLY ROE,

*Plaintiffs,*

– v. –

COUNTY OF WESTCHESTER,

*Defendant-Appellee,*

COUNTY OF WESTCHESTER COUNTY DEPARTMENT OF PUBLIC SAFETY, TERRANCE RAYNOR, Acting Commissioner of the Westchester Department of Public Safety, in his official capacity, NEW ROCHELLE POLICE DEPARTMENT, CITY OF WHITE PLAINS DEPARTMENT OF PUBLIC SAFETY, GEORGE LATIMER, Chief Executive of the County of Westchester, in his official capacity,

*Defendants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## OPENING BRIEF AND SPECIAL APPENDIX FOR PLAINTIFFS-APPELLANTS

CHRISTOPHER A. FERRARA
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, New York 11357
(718) 357-1040

MICHAEL MCHALE
THOMAS MORE SOCIETY
10506 Burt Circle, Suite 110
Omaha, Nebraska 68114
(402) 501-8586

*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

INTRODUCTION.................................................................................1

JURISDICTIONAL STATEMENT ........................................................7

STATEMENT OF ISSUES....................................................................7

STATEMENT OF THE CASE ...............................................................8

    A.  Factual Background. ...............................................................8

        1.   Plaintiffs and their pro-life speech.........................................8

        2.   The Bubble Zone's Legislative Background. ..........................16

        3.   The Bubble Zone's Operative Text. .......................................18

        4.   The Penalties for Violation....................................................19

        5.   The Bubble Zone's Impact. ...................................................20

    B.  Procedural History. ..............................................................23

SUMMARY OF THE ARGUMENT .....................................................31

STANDARD OF REVIEW....................................................................34

ARGUMENT ......................................................................................35

  I.  This Court Has Jurisdiction Over Plaintiffs' Appeal. ...................35

    A.  The District Court effectively denied a preliminary injunction as to the Bubble Zone.........................................................................36

    B.  Plaintiffs will suffer irreparable harm absent immediate review. ..........................................................................................40

    C.  Immediate review does not frustrate, but rather promotes, the policy against piecemeal appeals. ................................................44

  II.  Plaintiffs Satisfy the Factors for Obtaining a Preliminary Injunction Against Enforcement of the Bubble Zone. ...................47

i

A.  Plaintiffs are ultimately likely to succeed on the merits. .......... 47

    1.  The Bubble Zone expressly regulates specially protected speech based on content. ....................................... 47

    2.  The Bubble Zone fails both strict and intermediate scrutiny. ........................................................................52

B.  Irreparable Harm. ....................................................... 58

C.  Balance of Harms and Public Interest ...................................... 59

CONCLUSION ......................................................... 60

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
   138 S. Ct. 2305 (2018) ................................................................ *passim*

*Agostini v. Felton*,
   521 U.S. 203 (1997). ....................................................................... 51

*Agudath Israel of Am. v. Cuomo*,
   983 F.3d 620 (2d Cir. 2020)............................................................. 35

*Bose Corp. v. Consumers Union of United States, Inc.*,
   466 U.S. 485 (1984) ........................................................................ 35

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) ............................................................. 52, 53, 57

*Carey v. Population Servs. Int'l*,
   431 U.S. 678 (1977) ........................................................................ 46

*Carson v. American Brands, Inc.*,
   450 U.S. 79 (1981) ................................................................. *passim*

*City of Austin v. Reagan Nat'l Advert. of Austin*,
   142 S. Ct. 1464 (2022) ....................................................... 3, 50, 52, 59

*Connecticut State Police Union v. Rovella*,
   36 F.4th 54(2d Cir), *cert. denied*, 143 S. Ct. 215 (2022) ..................... 34

*Dobbs v. Jackson Women's Health Org.*,
   142 S. Ct. 2228 (2022) .............................................................. *passim*

*Elrod v. Burns,*
  427 U.S. 347 (1976) ....................................................................... 40, 58

*Gulfstream Aerospace Corp. v. Mayacamas Corp.,*
  485 U.S. 271 (1988) ............................................................................... 37

*Hague v. Comm. for Indus. Org.,*
  307 U.S. 496 (1939) ............................................................................... 47

*Hill v. Colorado,*
  530 U.S. 703 (2000) ...................................................................... *passim*

*Hulinsky v. Rutland City Police Dep't,*
  221 F.3d 357 (2d Cir. 2000)........................................................... 40, 44

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,*
  515 U.S. 557 (1995) ............................................................................... 35

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ............................................................................... 46

*McCullen v. Coakley,*
  573 U.S. 464 (2014) ...................................................................... *passim*

*Milltext Indus. Corp. v. Jacquard Lace Co.,*
  55 F.3d 34 (2d Cir. 1995)..................................................................... 42

*New York ex rel. Spitzer v. Operation Rescue Nat'l,*
  273 F.3d 184 (2d Cir. 2001)................................................................. 56

*New York Progress & Prot. PAC v. Walsh,*
  733 F.3d 483 (2d Cir. 2013)........................................................... 45, 60

iv

*New York v. Griepp*,
  991 F.3d 81 (2d Cir. 2021) .................................................... 4, 23, 24, 56

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................. 59

*People v. Griepp*,
  997 F.3d 1258 (2d Cir. 2021) .......................................................... 4, 23

*Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*,
  721 F.3d 95 (2d Cir. 2013) ................................................................. 42

*Price v. City of Chicago*,
  915 F.3d 1107 (7th Cir. 2019) .................................................. 44, 50, 51

*Reed v. Town of Gilbert Ariz.*,
  576 U.S. 155 (2015) ....................................................................... 33, 49

*Richardson Greenshields Sec., Inc. v. Lau*,
  825 F.2d 647 (2d Cir. 1987) ................................................................. 43

*Rodriguez ex rel. Rodriguez v. DeBuono*,
  175 F.3d 227 (2d Cir. 1999) ................................................................. 59

*Schenck v. Pro-Choice Network of Western New York*,
  519 U.S 357 (1997) .......................................................................... 57

*Snyder v. Phelps*,
  562 U.S. 443 (2011) .......................................................................... 47

*Texas v. Johnson*,
  491 U.S. 397 (1989). ......................................................................... 57

*Vitagliano v. County of Westchester*,
  7:22-cv-9370 (S.D.N.Y. Jan. 3, 2022), ............................................. 5, 26

*Volvo N. Am. Corp., v. Men's Int'l Pro. Tennis Council*,
  839 F.2d 69, 73 (2d Cir. 1998) ............................................ 36, 37, 42, 45

**Statutes**

18 U.S.C. § 248(c)(1) .................................................................. 54

18 U.S.C. § 248(d) ...................................................................... 55

28 U.S.C. § 1292(a)(1) .............................................................. 7, 35

28 U.S.C. § 1331 ........................................................................... 7

28 U.S.C. § 1343 ........................................................................... 7

Chapter 425 of Westch. Cnty. Laws § 425.21(a) .................................... 19

§ 425.21(b) .................................................................................. 19

§ 425.31(a) ............................................................................ 16, 55

§ 425.31(b) .................................................................................. 17

§ 425.31(c) .................................................................................. 17

§ 425.31(d) .................................................................................. 17

§ 425.31(e) ............................................................................ 17, 55

§ 425.31(f) ............................................................................. 17, 55

§ 425.31(g) ............................................................................... 17

§ 425.31(h) .............................................................................. 17

§ 425.31(i) ........................................................................ *passim*

§ 425.41(a) .............................................................................. 19

§ 425.41(b) .............................................................................. 19

§ 425.51 .................................................................................... 20

§ 425.71 .................................................................................... 20

N.Y. Penal Law § 240.70 .................................................... 54, 55

N.Y. Penal Law § 240.70(3)(d) ................................................. 55

N.Y.Penal Law § 140.10 ........................................................... 54

**Rules**

Fed.R.Civ.P. 4(b)................................................................. 24, 42

Fed.R.Civ.P. 54(b)...................................................................... 27

Joint Meeting of the Westchester County Legislature Committees on
   Health and Legislation, https://tinyurl.com/spew3xjx ................. 17, 18

Judge Halpern's Practice Standards, at 2(C)
   https://tinyurl.com/5ysy5k5j ...................................................... 24, 28

## **INTRODUCTION**

Over the past two decades, few principles of American law have become more clearly or solemnly recognized than the general rule that under the Free Speech Clause of the First Amendment, government may not restrict speech based on its content, including its substantive "purpose," without undergoing the most rigorous scrutiny in constitutional law—a test government rarely passes.

But in a fit of political rage (and recklessness) in the days of after the Supreme Court's decision in *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228 (2022), Westchester County did exactly what that hallowed principle forbids, explicitly in the hope that, as the County Attorney put it, "our legislation never gets to the Supreme Court" or even the "wrong" panel of *this* Court.

Specifically, the County adopted a floating "Bubble Zone" prohibiting individuals from "knowingly approach[ing]" another within eight feet, without their consent, "for the *purpose* of passing any material, item, or object to, displaying a sign to, or engaging in *oral*

*protest, education, or counseling* with such other person" within 100 feet from "any door" to a "reproductive health care facility" in the County.[1]

Astonishing admissions by County legislators show that the Bubble Zone was expressly tailored to shield individuals entering or exiting abortion facilities from the so-called "maximum fury" "of the First Amendment," and to prevent pro-life sidewalk counselors from distributing so-called "Trojan Horse gifts" as a "bridge" to conversation with women contemplating abortion.

Under the Bubble Zone, approaching another person in the restricted area to talk about sports or the weather is perfectly legal. But handing out a leaflet about the physical and psychological risks of abortion is forbidden "education"; uttering any statement against abortion—but not in *favor* of abortion—is forbidden "oral protest"; and speaking to a woman regarding her circumstances and alternatives to abortion is forbidden "counseling." Under the Bubble Zone, law enforcement must *closely observe the speaker's substantive message* to determine whether it is permitted speech or a criminal offense punishable by imprisonment.

---

[1] All emphasis in this brief is added unless otherwise noted.

The Bubble Zone is blatantly unconstitutional under prevailing First Amendment principles. But prior to the Supreme Court's recent affirmations of those principles, it upheld a materially identical bubble zone in *Hill v. Colorado*, 530 U.S. 703 (2000). As the Supreme Court has since made clear, however, that anomalous decision is now all but dead. In *Dobbs*, the Court specifically recognized that *Hill* was a "distort[ion] [of] First Amendment doctrines." 142 S. Ct. at 2276 & n.65. And in a separate case last term, the Court stated it was not "resuscitat[ing]" *Hill*. *City of Austin v. Reagan Nat'l Advert. of Austin*, 142 S. Ct. 1464, 1475 (2022).

But until *Hill* is formally overturned, Plaintiffs must apparently suffer irreparably under the Bubble Zone. Plaintiffs Oksana Hulinsky and Regina Molinelli have engaged in pro-life sidewalk advocacy and counseling outside Planned Parenthood facilities in Westchester County for years, while Plaintiff 40 Days for Life (40DFL), an international pro-life organization, relies on the volunteers of Plaintiff White Plains 40 Days for Life (WP-40DFL) to promote its mission in Westchester County by way of twice-a-year 40-day "Local Vigils" that include, besides prayer, sidewalk advocacy and counseling outside the White

3

Plains Planned Parenthood facility in Greenburgh, NY. As the legislative history reveals, the Bubble Zone was *designed* to impede this activity.

This lawsuit was commenced in August 2022 by two pseudonymous plaintiffs who feared publicity in light of the post-*Dobbs* violence then occurring throughout the country. The plaintiffs sought a preliminary injunction against the Bubble Zone and six additional provisions adopted simultaneously into a newly enacted Chapter 425 of the Laws of Westchester County.[2]

After the District Court *prohibited* Plaintiffs from even *filing* a preliminary injunction motion until it decided their motion to proceed pseudonymously, which remained undecided for months despite full briefing, a separate individual, Ms. Vitagliano, filed her own lawsuit, *Vitagliano v. County of Westchester*, 7:22-cv-9370, challenging only the

---

[2] The other prohibitions, including one on "interfering with" the "operation of a reproductive health care facility," and another on "follow[ing] and harass[ing]" over and against another's "*implied* request to cease" one's speech, were expressly adopted on the authority of this Court's decision in *New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021), even though *Griepp* had been *vacated in its entirety* by the *same panel* more than a year earlier. *See People v. Griepp*, 997 F.3d 1258 (2d Cir. 2021)

Bubble Zone. The case was assigned to the same District Judge, who quickly issued a 12(b)(6) dismissal of Vitagliano's complaint on the basis that *Hill* remains controlling. Vitagliano immediately appealed.

By that time, Plaintiffs here had twice amended their Complaint to include only fully identified parties, in part to end the District Court's delay given the urgency of their request for preliminary injunctive relief. The District Court finally held a pre-motion conference on Plaintiffs' motion for a preliminary injunction (as required by the Judge's Individual Practice Standards), nearly five months after Plaintiffs' initial request. During that conference the District Court repeatedly, emphatically, and *irrevocably* denied injunctive relief as to the Bubble Zone, concluding: "*I am not going to give you a different ruling in this case than I did in the* Vitagliano *case*," "period."

The District Court further expressed a willingness to issue a summary order denying Plaintiffs a preliminary injunction as to the Bubble Zone so that Plaintiffs could take an immediate appeal on that issue, and the County did not oppose. But the District Court refused to sign Plaintiffs' proposed order to that effect, concluding that it found "no

5

basis in law to bifurcate" Plaintiffs' underlying preliminary injunction motion.

Plaintiffs have appealed from the District Court's "effective denial" of a preliminary injunction against the Bubble Zone. Prior to this filing, Plaintiffs also moved this Court for an injunction pending appeal (IPA) and an expedited appeal and briefing schedule. This Court denied the IPA, but *granted* the motion for an expedited briefing schedule, ordering that this appeal be heard "in tandem with" the *Vitagliano* appeal (No. 23-30).

Post-*Dobbs*, there can be no doubt the Bubble Zone is causing Plaintiffs irreparable harm given the substantive protections of the First Amendment, despite the Supreme Court's *nominally* controlling decision in *Hill*. Yet today, Plaintiffs are in the midst of their second 40-day "Local Vigil" since the Bubble Zone's enactment without the ability to engage in actual sidewalk counseling—with untold costs to women open to considering alternatives to abortion (or post-abortion healing), and to their unborn children.

As Justice Scalia rightly observed in his prescient dissent in *Hill*, there is "no doubt that this regulation would be deemed content based

6

*in an instant* if [it] involved antiwar protesters, or union members…" *Hill*, 530 U.S. at 742 (Scalia, J., dissenting) (emphasis in original). It is long past time that *Hill* be reversed, and the County's preposterous Bubble Zone be enjoined.

## JURISDICTIONAL STATEMENT

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as this matter arose under the First and Fourteenth Amendments.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1), as the District Court effectively denied Plaintiffs' motion for a preliminary injunction against the Bubble Zone during the January 18, 2023 Pre-Motion Conference, and by rejecting, on January 25, 2023, Plaintiffs' consented-to proposed order reflecting that denial. SPA4 at 4:9-10; SPA.9 at 9:10-11; SPA.17 at 17:24-25; SPA.25. Plaintiffs timely appealed on February 3, 2023. App.376-77. *See infra* (Argument, Section I).

## STATEMENT OF ISSUES

I.    Whether this Court has jurisdiction under 28 U.S.C. § 1292(a)(1) to decide Plaintiffs' interlocutory appeal from the District Court's effective denial of Plaintiffs' motion for preliminary injunctive

7

relief against enforcement of Westchester County's eight-foot Bubble Zone law.

II.    Whether the Bubble Zone law's criminalization of pro-life sidewalk counseling without prior consent, including leafletting and "oral protest, education, or counseling" within the eight-foot forbidden zone, is a content-based speech restriction that fails strict, and even intermediate, scrutiny in violation of long-established First Amendment principles.

## STATEMENT OF THE CASE

**A.    Factual Background.**

**1.    Plaintiffs and their pro-life speech.**

Plaintiffs Regina Joy Creary Molinelli and Oksana Hulinsky are pro-life sidewalk counselors in Westchester County. App.65-70 ¶¶26-49. They believe that the moments when expectant mothers enter or leave an abortion facility are the last best hope of encouraging them to seek abortion alternatives, and that it is crucial to be able to approach these women for quiet, face-to-face conversation rather than calling out or holding signs at a distance. *Id.* ¶¶35, 47.

### a. Oksana Hulinsky

Hulinsky, a retired public school guidance counselor, has been engaged in pro-life sidewalk counseling and advocacy for approximately four years. App.65 ¶26. She usually does so every Thursday on the public sidewalk outside Planned Parenthood – New Rochelle Health Center in the County. *Id.* She has also participated in Local Vigils conducted by WP-40DFL outside the White Plains Planned Parenthood. App.66 ¶34. She desires to continue doing so if the Bubble Zone is enjoined. *Id.*

Hulinsky is motivated by her sincere religious beliefs as a Catholic Christian that abortion is the wrongful direct taking of innocent human life. App.65.¶27. She was inspired to become a sidewalk counselor and advocate when she saw color photos depicting the brutal destruction of an aborted unborn child. App.65 ¶28. Her conscience thus compels her to peacefully and lawfully encourage mothers, in face-to-face conversations, to choose life instead of abortion. App.65 ¶29.

Hulinksy's pro-life advocacy has included praying the Rosary, usually with others, and holding a 40 Days for Life sign on the public sidewalk. App.66 ¶¶30, 33. Her sidewalk counseling has included

9

peacefully approaching expectant mothers entering the facility in order to engage in short, quiet conversations, at normal conversational distance, while offering literature describing alternatives to abortion. App.66 ¶31. The literature provides information on adoption as well as available financial, medical, and housing assistance if an expectant mother contemplating abortion elects to choose life for her unborn child. App.66 ¶32; *see also* App.157-71 (Hulinksy sample literature).

The entrance to the New Rochelle facility where Hulinsky regularly advocates for life is directly adjacent to the public sidewalk, and thus her pro-life sidewalk counseling occurs well within 100 feet of the entrance. App.223; *see also* https://tinyurl.com/2p8ep7vu (Google Street View).

### b. Regina Molinelli

Molinelli, a Catholic school catechism teacher who is married with children, has been engaged in pro-life sidewalk advocacy and counseling outside abortion facilities in Westchester County for approximately eight years. App.67 ¶38. Molinelli is motivated by her sincere religious belief as a Catholic Christian that abortion is the wrongful direct taking of innocent human life. App.67 ¶39. Her Catholic faith, which informs

10

her conscience, compels her to oppose and publicly advocate and counsel against abortion, and in favor of life-affirming alternatives. App.67 ¶¶39,43. She believes she would sin by omission if she did not encourage expectant mothers, in face-to-face conversations, to choose life instead of abortion. App.67 ¶39.

Molinelli currently engages in pro-life advocacy and counseling outside the White Plains Planned Parenthood, usually during the twice-a-year 40-day "Local Vigil" organized by WP-40DFL. App.68 ¶¶41-42. She has received formal training in peaceful techniques for such advocacy and counseling. App.67 ¶40.

Her advocacy includes praying the Rosary on the public sidewalk adjacent to the facility, near the driveway leading to the facility's parking lots. App.68 ¶41. She also holds pro-life signs that display such messages as: "Pray to End Abortion," or the contact information of a pro-life organization that provides pregnancy assistance to mothers who elect not to choose abortion. App.69 ¶46.

Her sidewalk counseling requires a peaceful approach to expectant mothers and others entering or leaving the facility by car, or on foot, in order to engage in short, quiet conversation, at normal

conversational distance. App.68 ¶43. As part of this activity, she offers literature relating to the physical and psychological risks of abortion, fetal development, and alternatives to abortion, including contact information for adoption, financial, medical, and housing assistance if an expectant mother contemplating abortion elects not to abort her child. *Id.*; *see also* App.176-78 (Molinelli sample literature). One of her "primary concern[s]", in addition to the life of the unborn child, is the emotional state of the expectant mother, who may be "under duress" from being "pushed into" a decision she might come to regret later in life, App.68 ¶43, which makes a quiet, peaceful approach, rather than calling out from a distance, all the more important.

Molinelli also offers "Blessing Bags" containing food and other items as an act of kindness that lends itself to conversation about alternatives to abortion. App.68-69 ¶44. She has occasionally also offered roses to women and their companions entering or leaving the facility as a gesture of friendship and respect. App.69 ¶44.

Generally, if a car stops on the public portion of the driveway outside the White Plains Planned Parenthood facility, possibly to allow her to speak, Molinelli will walk up to the car to engage in conversation

12

with the occupants and offer literature and a "Blessing Bag." (App.69 ¶45.)

This activity occurs on the public right-of-way adjacent to the facility's driveway, well within 100 feet of the White Plains Planned Parenthood facility's front door. App.70 ¶48; App.173-75, 225. Although the front entrance is no longer left unlocked, occasionally those approaching the facility attempt to use that entrance, and they are admitted if they knock. App.70 ¶48. Molinelli has additional opportunities to counsel women face-to-face if they approach that entrance, although the driveway access is where the greatest opportunity lies. *Id.*

### c. 40 Days for Life

40DFL is an international pro-life advocacy organization that promotes 40-Day Local Vigils on public rights-of-way adjacent to abortion facilities throughout the nation, including outside the White Plains Planned Parenthood facility. App.63 ¶15. Its mission is to bring together the Body of Christ in a spirit of unity during twice-a-year 40-day campaigns of prayer, fasting, and peaceful sidewalk activism outside abortion facilities. App.61 ¶9.

13

Local Vigils include displaying fetal models, hosting rallies at the vigil site, directing women to an ultrasound bus/mobile pregnancy help center stationed nearby where legally permitted, processions to or around the vigil site, sidewalk outreach, counseling and advocacy, and referring women to pregnancy help centers. App.64 ¶19.

Local Vigils are independent from 40DFL, which neither directs nor leads any particular Vigil. App.62 ¶10. But 40DFL provides training and support for Local Vigil leaders (mostly volunteers) and allows its well-known brand "40 Days for Life" and associated registered trademarks ("logo") to be used in conjunction with Local Vigils, at the local leader's discretion, provided the participants all pledge to engage only in prayerful, peaceful, and lawful advocacy and obey any police orders to disperse rather than risk arrest. App.62 ¶¶10, 17; *see also* App.140 ("Statement of Peace").

40DFL offers training and encourages participants in Local Vigils to peacefully approach persons entering or leaving the facility, or passersby, to converse or offer literature on alternatives to abortion and other resources, including pregnancy help, adoption, post-abortion healing, abortion education information, and abortion pill reversal.

14

App.63 ¶18. This kind of sidewalk activism by participants in Local Vigils is important to 40DFL's mission. *Id.*

### d. White Plains 40 Days for Life

WP-40DFL is an unincorporated association of pro-life advocates that conducts Local Vigils on the public rights-of-way outside the White Plains Planned Parenthood. App.62 ¶11. The association exists for the common purpose of advocating for life and peacefully bringing about an end to abortion. App.64 ¶21.

During the twice-a-year 40-day Local Vigils, WP-40DFL volunteers gather at the aforesaid place to engage in prayer and pro-life advocacy, including with the use of 40DFL promotional materials. App.64. ¶¶21, 22. Volunteers are authorized to, and many do, approach persons entering or leaving the facility for one-on-one discussion or to offer literature on pro-life alternatives, including on pregnancy help, adoption, post-abortion healing, abortion pill reversal, and educational information. App.64 ¶23; *see also* App.149-55 (samples of literature handed out at 40 Days Local Vigils across the country, including Westchester County). WP-40DFL will immediately continue engaging in this activity if the Bubble Zone is enjoined, given the significant stakes

15

involved. App.64 ¶¶22, 23; *see also* App.63 ¶16 (40DFL Local Vigils have assisted more than 22,000 women around the world to choose life for their unborn children, and have persuaded staffers at abortion facilities to leave the abortion industry).

## 2. The Bubble Zone's Legislative Background.

On June 27, 2022, three days after the Supreme Court's decision in *Dobbs*, the County adopted Chapter 425 of the Laws of Westchester County, containing nine separate prohibitions on conduct and speech outside of "reproductive health care facilit[ies]." App.59 ¶1; App.70-71 ¶¶50-53; App.217-18 (§§ 425.31(a)-(i)). The County asserted that the law was the result of slow police response to a *single trespass incident* involving a non-violent sit-in *inside* an abortion facility in November 2021, for which the responsible individuals were convicted and jailed. App.59-60 ¶¶2-3; App.93 ¶107; App.195-96. But the enacted law imposes speech restrictions having nothing to do with trespass but rather (facially or as applied) pro-life speech *outside* abortion facilities. App.217-18. The single worst restriction is the Bubble Zone.[3]

---

[3] The additional provisions of § 425.31 prohibit the following: **Subsection (a)**: "physically obstruct[ing] or block[ing]," as defined to include physically "hindering" or "impeding," § 425.21(h), another

In contriving the Bubble Zone, legislators complained of "Trojan Horse gifts" such as "little roses," food, or drinks that pro-life advocates offer as a "bridge" to conversation. App.101-02 ¶124.[4] On the rationale that it would make the County's content-based discrimination "less blatant" and "less flagrant" (A.109-10, ¶139), the legislators amended the prohibition on passing a "leaflet or handbill" inside the bubble zone, as in *Hill*, to "passing any *material, item, or object*." App.101-02 ¶123). *Cf. Hill*, 530 U.S. at 707.

---

person from entering a reproductive health facility; **Subsection (b)**: physically assaulting another seeking to enter or exit the facility; **Subsection (c)**: "follow[ing] and harass[ing]" another within 25 feet of the facility's premises or parking lots, with "harass" defined to include "acts that continue after an express or implied request to cease has been made," 425.21(c); **Subsection (d)**: repeated acts that place another in reasonable fear of physical harm within 25 feet of the facility's premises or parking lots; **Subsections (e) and (f)**: using force or physical obstruction to, among other things, "interfere with" another "to discourage" another from, or "because" the other was or is, obtaining or providing reproductive health services, and defining "interfere with" as including "to stop . . . through deceptive means or otherwise," § 425.21(d); **Subsection (g)**: physically damaging a reproductive health facility so as to interfere with its operation; **Subsection (h)**: "interfer[ing] with the operation of a reproductive health care facility."

[4] Joint Meeting of the Westchester County Legislature Committees on Health and Legislation, https://westchestercountyny.granicus.com/player/clip/1454?view_id=1&redirect=true&h=36548071fec63c46b64b3f8ebeee1f57 (1:51:52).

Legislators also understood that there would be a "default" presumption "that there isn't consent." App.100 ¶122(a)-(b).)

The County knew the Bubble Zone would likely violate the First Amendment. At a Committee meeting in June 2022, the County Attorney advised that if the provision "ever got to the Supreme Court, I have real questions," given post-*Hill* Supreme Court decisions (discussed below), and "I think we know what the Supreme Court would rule if this ever got there," "so hopefully our legislation never gets to the Supreme Court." App.104 ¶129(b). The County Attorney further hoped the law is appealed "only to the Second Circuit; and we actually draw the right panel… because there's some recent appointees by the former President… that *I don't think would support us here*." *Id*.[5]

### 3. The Bubble Zone's Operative Text.

As noted, the Bubble Zone prohibits "knowingly approach[ing]" "within eight feet" of another person, "unless such person consents, for the *purpose of* passing any material, item, or object to, displaying a sign to, *or engaging in oral protest, education, or counseling* with such other

---

[5] Joint Meeting, *supra* n.4 (at 39:55).

person in the public way within a radius of one-hundred (100) feet from *any door* to a reproductive health care facility." § 425.31(i). App.211.

"Approach" means "to move nearer in distance to someone," § 425.21(a), ostensibly even by one inch. A.208.

And "Eight (8) feet" is specifically and super-sensitively defined as being "measured from the part of a person's body that is nearest to the closest part of another person's body, where the term 'body' includes any natural or artificial extension of a person, including, but not limited to, an *outstretched arm or hand-held sign*." § 425.21(b). A.208.

### 4. The Penalties for Violation.

Violations are punishable by up to $1,000 in fines and six months imprisonment for a first offense, and $5,000 in fines and one-year imprisonment for subsequent offenses. § 425.41(a)-(b). App.212. The County is authorized to bring a civil action for injunctive relief to "cure" any alleged violation. App.212-13.

The law also creates a cause of action for injunctive and monetary relief (including treble damages), on account of any violation, for the following persons: anyone "whose ability to access the premises of a reproductive health facility has been interfered with"; "any owner or

19

operator of a reproductive health care facility or owner of a building in which such facility is located"; and "any employee, paid or unpaid, and any volunteer working for such facility, and any invitee." § 425.51. App.212.

To top it off, the law provides for joint and several liability where anyone is deemed to have "acted in concert" with another to violate Chapter 425. § 425.71. App.213.

### 5. The Bubble Zone's Impact.

Because of the Bubble Zone, Plaintiffs have ceased approaching persons or vehicles entering or exiting Planned Parenthood facilities to engage in sidewalk counseling. App.84 ¶79. The public portion of the driveway access, where Plaintiffs approach vehicles at the White Plains Planned Parenthood, is within 100 feet of its front "door," and is thus subject to the Zone's restrictions. *See* § 425.31(i). App.86 ¶85; App.225. So is the area where Hulinsky advocates outside the New Rochelle Planned Parenthood (when she is not participating in a 40 Days Local Vigil at the White Plains Planned Parenthood) App.88 ¶91(a); App.223.

As a precaution, Hulinsky now prays while standing across the street (which is still within 100 feet of the facility's door) or in her car,

20

and she categorically refrains from offering literature or conversing with persons approaching or leaving the facility. App.88 ¶91(a). She has also advised a pro-life advocate attempting to offer literature to women near the facility to stand across the street with her instead, so as to avoid being charged herself with "in concert" liability for his possible violation of the Bubble Zone. App.88 ¶91(b).

Similarly, Molinelli has entirely ceased her pro-life counseling outside the White Plains Planned Parenthood, which had included going to the spot at the public portion of the driveway that was her primary point of encounter with persons approaching or leaving the facility. App.88 ¶91(c)-(d).

Additionally, after observing the reaction of WP-40DFL volunteers during the Fall 40-day Local Vigil at the White Plains Planned Parenthood from September 28, 2022 to November 6, 2022, a volunteer attested that "no one is . . . offer[ing] literature to the occupants of cars entering or leaving the facility, or approach[ing] cars that might wish to engage a pro-life advocate." App.328 ¶14.

Accordingly, an injunction against the Bubble Zone would allow Plaintiffs to resume "approach[ing]" persons and vehicles without first

21

obtaining affirmative consent. App.100 ¶122, App.329 ¶17. Indeed, an injunction against the Bubble Zone is the *sine qua non* for the resumption of the "quiet," "face-to-face" "conversation," "at a normal conversational distance," that Plaintiffs deem essential to sidewalk counseling. App. 65 ¶29; App.66 ¶31; App.67 ¶39; App.68 ¶43. This is especially true given the additional "primary concern" for "the condition of the mother who" may be "under duress" from being "pushed into" an abortion she ultimately doesn't want. App.68 ¶43.

Enjoining the Bubble Zone would plainly allow resumption of this fundamental First Amendment activity, even if Plaintiffs must, for example, continue to avoid "following" anyone in violation of the "no-follow-and-harass provision" (§ 425.31(c)), or "physically" "hinder[ing]" or "imped[ing]" another from accessing the facility (§ 425.31(a)). Indeed, in its Response to Plaintiffs' pre-motion conference letter in furtherance of their request for a preliminary injunction, the County argued (conveniently) that Chapter 425's other provisions *do not even affect Plaintiffs' speech*, while *it admitted* that such speech *is* "subject to" one allegedly "modest 'place' regulation"—*i.e.*, the Bubble Zone. App.339.

In sum, a preliminary injunction against the Bubble Zone would halt significant and discrete irreparable harm Plaintiffs are now suffering—in the midst of the 40-day Local Vigil that began on February 22—as a result of the Bubble Zone's enactment, even with Chapter 425's other provisions remaining in place.

## B.   Procedural History.

This action was filed on August 15, 2022 by two plaintiffs who sued under pseudonyms in light of the post-*Dobbs* violence then reverberating throughout the country. Dist.Ct.Dkt. 1 ¶¶17-24, and at 69. They challenged seven of the nine restrictions in Chapter 425,[6] particularly given that the County expressly derived its inspiration for the law from this Court's decision in *New York v. Griepp*, 991 F.3d 81 (2d Cir. 2021), which had construed the Freedom of Access to Clinic Entrances (FACE) Act, 18 U.S.C. § 248, to restrict "de minimis," "incidental contact," even when caused by "reach[ing] out to hand a patient a pamphlet," *id.* at 119, 124. That decision was so astonishingly errant that it was *entirely vacated* by the *same* panel *more than a year*

---

[6] There is no challenge to Subsection (b) (prohibiting physical assaults) or Subsection (g) (prohibiting physical damage to reproductive health facilities).

23

*earlier. People v. Griepp*, 997 F.3d 1258 (2d Cir. 2021). Yet the County expressly relied on this legal nullity to justify Chapter 425. App.106, 108 ¶¶130, 136-37; App.201.

Although the Complaint's Prayer for Relief requested a preliminary injunction, App.133, Plaintiffs' efforts to obtain that relief were blocked from the start.

First, the Clerk's Office refused to issue summonses (despite Plaintiffs' counsel having properly completed them (Dist.Ct.Dkt. 4)) so long as the Court had not granted Plaintiffs leave to proceed pseudonymously. App.34; *cf.* Fed.R.Civ.P. 4(b) ("If the summons is properly completed, the clerk *must* sign, seal, and issue it to the plaintiff for service on the defendant.").

Then, in compliance with Judge Halpern's Practice Standards, at 2(C),[7] Plaintiffs filed three mandatory pre-motion conference letters on August 27, 2022, in furtherance of their intended motions for a preliminary injunction (Dist.Ct.Dkt. 7), to file an oversized brief (Dkt. 8), and to proceed pseudonymously (Dkt. 9). But on September 15, the Court purported to "den[y]" Plaintiffs "leave" to file *a preliminary*

---

[7]https://www.nysd.uscourts.gov/sites/default/files/practice_documents/PMH%20Halpern%20Rules%20Rev%2005.02.2022%20.pdf

*injunction motion* and a motion for an oversized brief, until it decided the motion to proceed pseudonymously. App.35. Plaintiffs complied, filing the motion to proceed under pseudonyms on September 30, 2022, (App.51), having ceased their sidewalk advocacy and counseling in the meantime. Dist.Ct.Dkt. 1 ¶¶84-86. But the Court took no action on the motion during the ensuing months.

After experiencing the chilling effects of Chapter 425 during the Fall 40-day Local Vigil, WP-40DFL and 40DFL joined the action on November 23, 2022. Dist.Ct.Dkt. 45. Indeed, WP-40 DFL volunteer Brian Burke attested that attendance during the Fall Local Vigil "diminished by about 50% compared to past vigils." App.329 ¶16.

With the District Court still delaying a decision on the motion regarding pseudonyms, and given the urgent, life-and-death impact of the Bubble Zone law, Plaintiff Sally Roe decided to sue under her real name (Molinelli), while Plaintiff Jane Doe dropped out, with Plaintiff Hulinsky replacing her. To this end, the parties jointly moved on December 15, 2022, to file a Second Amended Complaint, which the District Court granted. Dist.Ct.Dkt. 50, 51. At the same time, the District Court finally denied Plaintiffs' motion regarding pseudonyms,

25

(finding it moot)—nearly *four months* after they had filed their corresponding pre-motion conference letter. Dist.Ct.Dkt. 51&52. Plaintiffs filed their Second Amended Verified Complaint with identified parties on December 20, 2022. App.59.

Meanwhile, a separate individual (Ms. Vitagliano), represented by separate counsel, filed a related case assigned to the same district judge on November 1, 2022, challenging only the Bubble Zone. *Vitagliano*, 7:22-CV-9370-PMH (S.D.N.Y.). In a December 21, 2022 response to the County's pre-motion conference letter to dismiss under Rule 12(b)(6), Vitagliano conceded that *Hill* controlled and that her Complaint could be dismissed. App.42. The District Court obliged, dismissing Vitagliano's Complaint on January 3, 2023, without briefing, and holding that, because *Hill* upheld a "materially identical" bubble zone law in Colorado, it "foreclosed" arguments that the County's Bubble Zone is content-based and not narrowly tailored. App.48-50. The Court further opined *sua sponte* that Vitagliano lacked standing as she had not performed sidewalk counseling prior to filing suit. App.46-47. Vitagliano appealed the next day. 7:22-CV-9370, Dist.Ct.Dkt. No.33; 2d Cir. No. 23-30.

Plaintiffs here filed a letter with the District Court on December 22—the day after Vitagliano conceded her Complaint could be dismissed without briefing—likewise conceding that *Hill* controls as to their Bubble Zone claim. App.330; Dist.Ct.Dkt. 52. They thus requested that their Bubble Zone challenge be treated the same as in *Vitagliano*, and that its dismissal be certified as final under Fed.R.Civ.P. 54(b), which provides that a court may direct final judgment as to fewer than all claims where there is more than one claim and it "expressly determines that there is no just reason for delay." App.330-31; Dist.Ct.Dkt. 52. Plaintiffs explained that a Rule 54(b)-certified dismissal would avoid the undue prejudice Plaintiffs would incur if their challenge to the Bubble Zone were effectively decided by the *Vitagliano* appeal without their participation, and that it would serve judicial economy by reducing the number of issues for the District Court to consider in Plaintiffs' impending preliminary injunction motion. App.331.

The District Court "denied" this request the following day "without prejudice to renewal after Defendant files its response to the Second Amended Complaint." App.330.

27

On December 30, Plaintiffs filed a letter renewing their request for a pre-motion conference on their motion for a preliminary injunction, specifically seeking relief by February 22, 2023, i.e., the first day of the Spring 40 Days Local Vigil. App.332, 336. While Plaintiffs' Second Amended Complaint also pled a Free Exercise claim against Chapter 425 generally, including against the Bubble Zone, Plaintiffs' pre-motion conference letter sought preliminary injunctive relief only on grounds of vagueness, overbreadth, content-based discrimination, and failure of intermediate scrutiny. App.335-36; *see also* Judge Halpern Pract. Stnds. 2(C) ("Arguments not raised in the pre-motion letters or during the pre-motion conference shall be deemed waived.").

For its part, the County argued that Plaintiffs should not even be permitted to *move* for preliminary injunction ("Plaintiffs' request *to move* for a preliminary injunction should be denied"). App.342. The District Court, however, "granted" Plaintiffs' "[a]pplication for a pre-motion conference," but set the conference for nearly three weeks later, January 18, 2023, the day after the County filed its Answer. App.343; Dist.Ct.Dkt. 60.

28

During the January 18 conference, the District Court stated categorically that it would not grant injunctive relief as to the Bubble Zone in light of its decision in *Vitagliano*. Specifically, the Court stated:

- "*I am not going to change my mind on what I have written on* Vitagliano*, **period**.*" SPA.9 at 9:10-11;

- "*I am not going to grant an injunction in this scenario because **it's exactly the same as [] Vitagliano**.*" SPA.17 at 17:23-25;

- As to "425.31(i), ***I have already ruled on**, and **I am not going to give you a different ruling in this case** than I did in the* Vitagliano *case.*" SPA.4 at 4:9-11.

The Court acknowledged that a summary denial of injunctive relief as to the Bubble Zone "seems to me to be something that's entirely reasonable" given the Court's view that "it's exactly the same as *Vitagliano*." (SPA.4 at17:19-25.) The Court contemplated entering an order "on consent" to that effect, as the County did not object. (SPA.4 at 9:8-20, 17:24-18:4.)

Plaintiffs filed the contemplated order the next day, on January 19. App.349. Yet the Court denied the application on January 25, "find[ing] no basis in law to bifurcate the motion for preliminary

injunction." SPA.25. The Court thus put Plaintiffs to the task of futilely moving and briefing on an issue of preliminary injunctive relief the Court had already declared to be ***irrevocably*** decided against them. *Id.*

On February 3, Plaintiffs filed their Notice of Appeal "from the District Court's *effective* denial" of their "motion for preliminary injunctive relief" as to the Bubble Zone exclusively, based on (1) the District Court's categorical express determination at the January 18 pre-motion conference that it would not grant injunctive relief against the Bubble Zone given its decision in *Vitagliano*, and (2) its Order denying Plaintiffs' consented-to Proposed Order reflecting this determination. App.366-67.

On February 10, Plaintiffs filed a motion for an IPA and an expedited appeal and briefing schedule, requesting relief by February 22, 2023, the first day of the Spring 40 Days Local Vigil. No. 23-155 Doc. 14-1.

On February 22, a motions panel of this Court denied Plaintiffs' request for an IPA, but *granted* their request for expedited appeal and briefing, ordering that Plaintiffs' appeal "be heard in tandem with" the *Vitagliano* appeal and "calendar[ed] . . . for the first available panel

after the appeal is fully briefed." No. 23-155 Doc. 56. Plaintiffs now submit this brief in furtherance of that Order.

## SUMMARY OF THE ARGUMENT

I.    The District Court effectively denied Plaintiffs' motion for a preliminary injunction by **(a)** issuing a Rule 12(b)(6) dismissal of the Complaint challenging only the Bubble Zone in *Vitagliano*, on the basis that *Hill* controls; **(b)** repeatedly stating during its mandatory pre-motion conference in this case, in anticipation of Plaintiffs' preliminary injunction motion against the Bubble Zone and additional prohibitions of Chapter 425, that "*I have already ruled on* [the Bubble Zone], and *I am not going to give you a different ruling in this case than I did in the* Vitagliano *case*." SPA.4 at 4:9-11; and **(c)** denying Plaintiffs' consented-to proposed order, invited by the District Court at the pre-motion conference and *consented to* by opposing counsel, that would have formally embodied the Court's expressly *irrevocable* declaration at the pre-motion conference that it would not grant a preliminary injunction as to the Bubble Zone during the pendency of Plaintiffs' remaining preliminary injunction claims—despite Plaintiffs having requested a

need for relief by February 22, 2023, the beginning of the Spring 40-day "Local Vigil." SPA.25.

"The import of these actions is unmistakable," *Abbott v. Perez*, 138 S. Ct. 2305, 2322 (2018), as they "effectively foreclosed" "consideration of the merits of [plaintiffs'] injunction claim." *Carson v. American Brands, Inc.*, 450 U.S. 79, 86 n.11, 89 n.12 (1981).

The District Court's ruling also threatens irreparable harm absent immediate review, *Abbott*, 138 S. Ct. at 2319, as violations of First Amendment rights are a quintessential irreparable harm, and approaching individuals outside abortion facilities to sidewalk "counsel" and "educate" about abortion is the most protected form of speech under the First Amendment. *McCullen v. Coakley*, 573 U.S. 464, 489 (2014). This is all the more so after the Supreme Court deemed *Hill* a "distort[ion]" of "First Amendment doctrines." *Dobbs*, 142 S. Ct. at 2276.

Further, absent immediate appeal, whether the Bubble Zone violates Plaintiffs' rights will be decided in the *Vitagliano* appeal without their participation, during the pendency of the already protracted litigation on their remaining claims in the District Court.

32

Deciding Plaintiffs' appeal will not frustrate the policy against piecemeal appeals, because the Bubble Zone is entirely discrete from Plaintiffs' remaining claims, none of which would secure equivalent injunctive relief. Indeed, deciding this appeal in tandem with *Vitagliano* will avoid piecemeal appellate litigation regarding the Bubble Zone.

**II.** The Bubble Zone blatantly violates Plaintiffs' First Amendment rights. As the Supreme Court has recently clarified, government cannot facially restrict speech based on its "communicative content"—including its substantive "purpose"—without passing strict scrutiny. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). Laws restricting speech out of concern with its emotive impact on potential listeners must also undergo strict scrutiny. *McCullen*, 573 U.S. at 481. Because *Hill* ignored these principles, the Supreme Court has now rightly deemed *Hill* a "distort[ion]" of "First Amendment doctrines." *Dobbs*, 142 S. Ct. at 2276 & n.65.

The Bubble Zone directly violates those doctrines. It explicitly restricts speech "*for the purpose of* passing any material . . . to, or engaging in oral protest, education, and counseling" with another person near abortion facilities. And it does so to accomplish the

County's express, patently unconstitutional purpose of insulating people from the so-called "maximum fury" "of the First Amendment."

The Bubble Zone easily fails intermediate, let alone strict, scrutiny. It burdens far more speech than necessary to achieve the County's interest, which was assertedly to prevent *trespasses inside* abortion facility buildings, and to otherwise protect clinic access. Federal laws like the FACE Act, its New York analogue, and a state trespassing statute, among other laws, are more narrowly tailored means of achieving the County's purposes. Moreover, it is never a legitimate, let alone compelling, interest to protect individuals on public streets and sidewalks from the emotive impact of speech on a matter of utmost public concern like sidewalk counseling about abortion alternatives.

The Bubble Zone is thus flatly inconsistent with Plaintiffs' First Amendment rights, and the anachronism of *Hill* must be overruled.

## STANDARD OF REVIEW

This Court "review[s] the denial of a preliminary injunction for abuse of discretion, examining a district court's legal conclusions *de novo* and factual conclusions for clear error." *Connecticut State Police*

34

*Union v. Rovella*, 36 F.4th 54, 61-62 (2d Cir), *cert. denied*, 143 S. Ct. 215 (2022) (emphasis in original). In First Amendment cases the reviewing court has "a constitutional duty to conduct an independent examination of the record as a whole, without deference to the trial court," and "must thus decide for [itself] whether a given course of conduct falls on the near or far side of the line of constitutional protection." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.,* 515 U.S. 557, 567, 115 S. Ct. 2338, 2344, 132 L. Ed. 2d 487 (1995), citing *Bose Corp. v. Consumers Union of United States, Inc.,* 466 U.S. 485, 499 (1984).

To obtain a preliminary injunction against the government, Plaintiffs must show: "(1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020).

## ARGUMENT

### I.   This Court Has Jurisdiction Over Plaintiffs' Appeal.

This Court has jurisdiction over Plaintiffs' interlocutory appeal pursuant to 28 U.S.C. § 1292(a)(1) because the District Court clearly, categorically, and irrevocably declared it would not grant Plaintiffs a

preliminary injunction against the Bubble Zone in light of its prior ruling in *Vitagliano*. The appeal is also immediately reviewable because otherwise Plaintiffs will suffer continued irreparable harm from the operation of the Bubble Zone, and because their rights will otherwise be determined by the *Vitagliano* appeal without their participation. And the Bubble Zone issue is entirely discrete from Plaintiffs' remaining challenges in the District Court, none of which, in themselves, ban unconsented approaches to engage in quiet conversations with others about alternatives to abortion.

### A. The District Court effectively denied a preliminary injunction as to the Bubble Zone.

"[W]here an order has the 'practical effect' of [] denying an injunction, it should be treated as such for purposes of appellate jurisdiction." *Abbott v. Perez*, 138 S. Ct. 2305 (2018) As the Supreme Court observed: "This 'practical effect' rule serves a valuable purpose," because "[i]f an interlocutory injunction is improperly [] denied, much harm can occur before the final decision in the district court." *Id*. at 2319.

A ruling with the "practical effect" of denying an injunction is appealable under 28 U.S.C. § 1292(a)(1) if it "threaten[s] serious and

36

perhaps irreparable harm if not immediately reviewed." *Id.* at 2319 (citing *Carson v. American Brands, Inc.*, 450 U.S. 79, 83-84, 86-90 (1981) (order declining to enter consent decree enjoining racially discriminatory promotion and transfer practices immediately appealable under § 1292(a)(1)). *See also Volvo N. Am. Corp., v. Men's Int'l Pro. Tennis Council*, 839 F.2d 69, 73 (2d Cir. 1998) (requiring showing that order "can be 'effectually challenged' only by immediate appeal"); *but see id.* at 74 (recognizing that granting or denying *preliminary injunction* "which touches upon the merits of [plaintiffs'] claim" is "immediately appealable . . . *without regard to considerations of irreparable harm*").

As *Abbott* teaches, "if the availability of interlocutory review depended on the district court's use of the term 'injunction' or some other particular language, Congress's scheme" for allowing interlocutory appeals under § 1292(a)(1) "could be frustrated," whereas "[t]he 'practical effect' inquiry prevents such manipulation." *Abbott*, 138 S. Ct. at 2319. Further, "the 'practical effect' analysis applies to the 'granting *or denying*' of injunctions." *Id.* at 2321 (quoting *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 287-88 (1988)).

37

Here, "the text" of the District Court's rulings "and the context in which they were issued make [] clear" this Court's jurisdiction. *Abbott*, 138 S. Ct. at 714.

As noted, in *Vitagliano* the District Court deemed § 425.31(i) "materially identical" to the bubble zone upheld in *Hill v. Colorado*, and thus found *Hill* controlling and dismissed Vitagliano's Complaint alleging that the Bubble Zone is a content-based regulation of speech and fails intermediate scrutiny. App.48-49. Then, as noted, during the *preliminary injunction pre-motion conference* in this case, the same District Judge made clear that he would apply the same ruling to Plaintiffs' request for an injunction against the Bubble Zone, stating that "*I have already ruled on*" the Bubble Zone, that "I am not going to give you a different ruling in this case than I did in [] *Vitagliano*," and "I am not going to grant an injunction in this scenario because it's *exactly the same* as *Vitagliano*." (SPA.4 at 10:9-10; 17:23-35.) Therefore "the District Court made clear that it would not enter" an injunction against the Bubble Zone so long as *Hill* survives. *Carson*, 450 U.S. at 89 n.12.

The District Court also informed Plaintiffs' counsel during the pre-motion conference that any hope of obtaining a decision by February 22, which Plaintiffs had requested in their pre-motion conference letter on December 30, is "just simply illusory." SPA.4 at 4:6-7. The Court thus made clear that it "did not intend to allow [plaintiffs] to go ahead," *Abbott*, 138 S. at 2322, free from the Bubble Zone by February 22.

Yet the Court still denied Plaintiffs' proposed order reflecting its unequivocal and irrevocable determination on the ground that it found "no basis in law to bifurcate" Plaintiffs' motion. SPA.25. "[B]ut the label attached to an order is not dispositive," *id.* at 2319, whereas "[t]he import of [the Court's] actions is unmistakable." *Id.* at 2322.

In reality, "the District Court necessarily decided that upon the facts alleged" and the arguments raised in Plaintiffs' pre-motion conference letter,[8] "plaintiffs were not entitled to an injunction." *Carson*, 450 U.S. at 86 n.11. Thus the District Court "did more than postpone consideration of the merits of petitioners' injunctive claim[;]

---

[8] The District Court's Individual Practice Standards specifically provide that "the pre-motion conference letter may be construed, at the discretion of the Court, as the motion itself." *Supra* n.8 at No. 2(C).

39

[i]t *effectively foreclosed such consideration.*" *Id.* at 89 n.12 (internal

quotes omitted).

### B. Plaintiffs will suffer irreparable harm absent immediate review.

Plaintiffs will suffer, and are suffering, "serious and perhaps

irreparable harm" absent immediate appeal review. "The loss of First

Amendment freedoms, for even minimal periods of time, unquestionably

constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373

(1976). And, as the Supreme Court has now made clear, it no longer

credits *Hill* because that decision was a "distort[ion] [of] First

Amendment doctrines." *Dobbs*, 142 S. Ct. at 2276.

Further, because "[n]o form of speech is entitled to greater

constitutional protection" than sidewalk counseling and leafletting

about abortion alternatives, *McCullen*, 573 U.S. at 489, Plaintiffs' need

for relief is especially urgent. *Accord Carson*, 450 U.S. at 89 (because

petitioners claimed "they would suffer irreparable injury unless they

obtained [] injunctive relief" requiring defendant employer to

restructure discriminatory transfer and promotional policies, "any

further delay in reviewing the propriety of the District Court's refusal to

enter the decree might cause them serious or irreparable harm").

40

The need for this immediate appeal is only confirmed by the fact Plaintiffs "move[d] for" and "pursue[d] a preliminary injunction" below and then "made [an] effort in this Court to expedite [their] appeal." *Hulinsky v. Rutland City Police Dep't*, 221 F.3d 357, 359-61 (2d Cir. 2000) (rejecting immediate appealability of interlocutory orders dismissing fewer than all claims where petitioner failed to take these steps); *see also Volvo*, 839 F.2d at 74 (recognizing cases holding "that a failure to pursue preliminary injunctive relief [] militates against interlocutory appellate review").

As the procedural history here shows, Plaintiffs filed their original pre-motion conference letter for a preliminary injunction on August 27, 2022, *see* Dist. Ct. Dkt. 7, and their renewed pre-motion letter to that effect on December 30. *See* App.43. They also proposed "certification under Rule 54(b) . . . in order to pursue an immediate appeal" of their Bubble Zone challenge. *See* App.330, SPA.17 at 17:3-6. Only after the District Court rejected these approaches, and then rejected a consented-to order reflecting the Court's unequivocal denial of a preliminary injunction, did they file this appeal and their motion for an IPA and expedited review and briefing. *See* No 23-155, Doc. 14-1.

41

Additionally, that a motions panel of this Court *granted* Plaintiffs'
motion for expedited briefing and directed that this appeal be
calendared and heard in tandem with *Vitagliano* by the *first available
panel* further confirms the necessity of immediate reviewability. No. 23-
55, Doc. 56.

Further, the District Court's actions can be "effectually
challenged" *only* by immediate appeal. As a result of the District Court's
substantial delays in adjudicating Plaintiffs request for injunctive
relief, Plaintiffs' right to relief from the Bubble Zone would otherwise
have been decided without their participation in the *Vitagliano* appeal
(No. 23-30). *See also Volvo*, 839 F.2d at 76 (delaying appellate review of
dismissed antitrust claims until conclusion of "potentially protracted
litigation below" would be "likely to have a serious and irreparable
impact").

Specifically, the Clerk's refusal to issue properly completed
summonses at the beginning of this case was a flat violation of federal
law. *See* Fed.R.Civ.P. 4(b); *see also Police & Fire Ret. Sys. of City of
Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 108 (2d Cir. 2013) ("The
Federal Rules of Civil Procedure . . . have the force [and effect] of a

federal statute."). And the District Court's order purporting to "den[y]" Plaintiffs "leave" to file a preliminary injunction motion directly violated Second Circuit precedent. *See Milltext Indus. Corp. v. Jacquard Lace Co.*, 55 F.3d 34, 39 (2d Cir. 1995) ("[T]he judge may not require that the court's permission be secured at [a pre-motion conference] before a party may file the motion."). And when Plaintiffs' renewed pre-motion conference letter requested relief by February 22, App.332, 336, the District Court delayed that conference for nearly three weeks. App.343. *Cf. Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987) (where movant "indicates its belief that time is of the essence, . . . the judge must either conduct a conference *immediately* or permit the motion to be filed *without a conference*").

Then, even after the District Court repeatedly stated at the already delayed pre-motion conference that it would deny injunctive relief as to the Bubble Zone per *Vitagliano*, it refused to issue an order to that effect and ruled it would only consider a motion "as to *all* of" Plaintiffs' "challenged provisions . . . once the motion is sub judice." SPA.25. The Court thus negated a key purpose of the pre-motion conference—consensual reduction of issues to be decided—thereby

43

turning what should have been an efficiency-promoting conference into just another reason for delay *on an issue that had already been decided* with no prospect of the Court changing its mind. *Id.* at 652 ("[Pre-motion conferences] may serve the useful purpose of . . . preventing the filing of unnecessary papers.").

Moreover, after taking nearly three months before never truly deciding Plaintiffs' motion to proceed under pseudonyms, the District Court acknowledged at the pre-motion conference that "it's going to take some time and effort" to work through Plaintiffs' remaining challenges to Chapter 425's welter of other speech restrictions, inspired in large part by the vacated *Griepp* decision. SPA.7 at 2-3. On the other hand, even the County admits that the patently unconstitutional Bubble Zone is apparently DOA in the Supreme Court or even before the "wrong" panel of this Court.

### C. Immediate review does not frustrate, but rather promotes, the policy against piecemeal appeals.

This appeal does not frustrate the policy against piecemeal appeals, *see Hulinsky*, 221 F.3d at 359 (internal quotes omitted), because Plaintiffs' challenge to the Bubble Zone hinges discretely and entirely on the holding in *Hill*, which still "directly controls" (at least

nominally) as to the validity of the County's materially identical Bubble Zone. *See Price v. City of Chicago*, 915 F.3d 1107, 1119 (7th Cir. 2019).

Indeed, consideration of the underlying appeal alongside *Vitagliano* will *avoid* piecemeal litigation against the Bubble Zone. The County has rightly acknowledged that in *Vitagliano* "the issue before this Court is the ultimate question on the merits." No. 23-155, Doc. 40-1 at 9. And because Plaintiffs' preliminary injunction motion arises "in the First Amendment context, . . . likelihood of success on the merits is the dominant, if not the dispositive, factor." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013).

Moreover, because the 12(b)(6) dismissal in *Vitagliano* and the denial of a preliminary injunction here involve overlapping factors, they are suited to review together. *See San Filippo v. United Bro. of Carpenters & Joiners*, 525 F.2d 508, 512-13 (2d Cir. 1975) (recognizing that the overlap between a 12(b)(6) dismissal and denial of a PI allows joint review).

Finally, the Bubble Zone issue is certainly discrete from Plaintiffs' other challenges. An injunction against the Bubble Zone will allow Plaintiffs to resume peaceful approaches to passersby outside abortion

clinics, whereas an injunction against the remaining provisions would *not* provide "equivalent injunctive relief." *Volvo*, 839 F.2d at 76.[9]

For all the reasons stated, this Court has jurisdiction over Plaintiffs' appeal.

---

[9] For same reasons, Plaintiffs have standing to obtain an injunction against the Bubble Zone during the pendency of their remaining challenges in the District Court. Unlike the other challenged provisions, the Bubble Zone *explicitly* restricts Plaintiffs from approaching others to engage in unobstructive, quiet, and face-to-face conversations that "educate" and "counsel" about abortion alternatives, and to distribute literature with more information about these options, without first obtaining the other's express consent. *See* App.210-11. This injury is thus "fairly traceable" to the Bubble Zone, and would actually (let alone "likely") be redressed by Plaintiffs' requested injunction in this appeal, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), even if Plaintiffs must remain vigilant to avoid violating the other challenged provisions of Chapter 425 so long as they remain in place.

Additionally, Plaintiffs' years-long practice of engaging in sidewalk counseling, and their intent to continue doing so again when legal, App.88 ¶91(a)-(d), App.90 ¶96, plainly establishes the requisite injury-in -fact under the same principles described in the Plaintiff-Appellant's Opening Brief in *Vitagliano*. *See* No. 23-30, Doc. 40 at 20-25. Indeed, neither the County nor the District Court has disputed Hulinsky and Molinelli's standing to challenge the Bubble Zone. *See* SPA.10 at 10:23-24 (District Court stating "you have two plaintiffs who clearly have standing"). Because at least one plaintiff has standing "to maintain the action," this Court "ha[s] no occasion to decide the standing of the [organizational plaintiffs]." *Carey v. Population Servs. Int'l*, 431 U.S. 678, 682 (1977).

II.    **Plaintiffs Satisfy the Factors for Obtaining a Preliminary Injunction Against Enforcement of the Bubble Zone.**

A.    **Plaintiffs are ultimately likely to succeed on the merits.**

The Bubble Zone explicitly restricts speech based on content, discriminating against speech made for a certain substantive "purpose," based on legislators' improper interest in the emotive impact of pro-life sidewalk counseling.  It manifestly fails strict scrutiny. But even if it were content neutral, it fails intermediate scrutiny by restricting far more speech than necessary for the purported protection of access to abortion facilities.

1.    **The Bubble Zone expressly regulates specially protected speech based on content.**

Public rights-of-way have, from "time out of mind, [] been used for the purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Hague v. Comm. for Indus. Org.*, 307 U.S. 496, 515 (1939). And "speech on public issues . . . is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (internal quotes omitted).

But in *Hill*, the Supreme Court upheld Colorado's eight-foot bubble zone despite its flagrant disregard of these values. The Court

47

deemed the law content-neutral because (a) it "was not adopted because of disagreement with the message the speech conveys," and (b) does not restrict speech based on viewpoint or "subject matter," even if it required a supposedly "cursory examination" of speech to determine if it was for the prohibited "purpose of . . . engaging in oral protest, education, or counseling." *Hill*, 530 U.S. at 719-20, 722-23. *Hill* also held that the bubble zone satisfied intermediate scrutiny because it was narrowly tailored to protect the supposed "right to be let alone." *Id.* at 716, 726-30.

In *McCullen v. Coakley*, however, the Supreme Court declared that public streets and sidewalks "remain one of the few places where a speaker can be confident that he is not simply preaching to the choir" and "a listener often encounters speech he might otherwise tune out," which "is a virtue, not a vice." 573 U.S. at 478. *McCullen* recognized that a speech restriction is content-based "if it require[s] enforcement authorities to examine the content . . . to determine whether a violation has occurred," or if it is concerned with the "undesirable effects that arise from . . . listeners' reactions to speech," such as "caus[ing] offense or ma[king] listeners uncomfortable" outside abortion clinics. *Id.* at 481.

48

The Court went on to find the buffer zone content-neutral only because it governed *where* people spoke, not *what* they said. *Id.* at 479-80.

But *McCullen* nonetheless held that the zone failed intermediate scrutiny as it "compromise[d] petitioners' ability **to initiate the close, personal conversations that they view as essential to 'sidewalk counseling'**," and "made it **substantially more difficult**" to "**distribute literature to arriving patients**," including "**as drivers turn into the parking lots**." *Id.* at 488. *McCullen* recognized that "handing out leaflets [on] a politically controversial viewpoint is the essence of First Amendment expression," and that sidewalk counselors "**seek not merely to express their opposition to abortion, but to inform women of various alternatives and to provide help in pursuing them**." *Id.* at 488-89. The government failed to show that draconian burdens on this speech were necessary to protect public safety outside abortion clinics, in part because "existing local ordinances," "general criminal statutes" and targeted injunctions already furthered that interest. *Id.* at 490-494.

One year later, the Supreme Court further clarified that a speech restriction "is content based if [it] applies to particular speech because

49

of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). This "requires a court to consider whether a regulation of speech 'on its face' draws distinctions based on the message a speaker conveys," whether by its "subject matter" *or* its "function or purpose." *Id.* at 163-164. The Court thus struck down a sign ordinance facially distinguishing "Temporary Directional Signs," "Political Signs," and "Ideological Signs," and rebuked the lower court's reliance "on this Court's decision in *Hill v. Colorado*" in finding the law content-neutral merely because the town "did not adopt its regulation [] because it disagreed with the message conveyed." *Id.* at 162-63, 164-72. The Supreme Court clarified that it "is incorrect" that a benign governmental purpose is relevant "when a law is content based on its face." *Id.* at 166-67.

Accordingly, as the Seventh Circuit has since observed, "*Hill* is incompatible with current First Amendment doctrine as explained in *Reed* and *McCullen*." *Price*, 915 F.3d at 1117.

Not to the contrary is *City of Austin, Texas v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464 (2022), upholding an ordinance distinguishing between on- and off-premises signs as content-neutral

50

even though it requires enforcers to read signs to determine whether they direct viewers to off-premises locations. The Court held that the ordinance does "not single out any topic or subject matter for differential treatment," but requires review of a sign's message "only to the extent that it informs the sign's relative location," while its "*substantive* message is irrelevant." *See id.* at 1472-73. In response to Justice Thomas's dissent (joined by Justices Barrett and Gorsuch) that the majority "risk[s] resuscitating *Hill*," *id.* at 1492 (Thomas, J., dissenting), the majority clarified that "we do not . . . 'resuscitat[e]' a decision we do not cite." *Id.* at 1475.

More recently, as noted above, *Dobbs* expressly declared *Hill* was a "distort[ion] [of] First Amendment doctrines." *Dobbs*, 142 S. Ct. at 2276 and n.65. By pinpoint-citing the *Hill* dissents, the Court made it perfectly clear that *Hill* is not merely "incompatible with current First Amendment doctrine," *Price*, 915 F.3d at 1117, but that *Hill* itself is an "assault upon [sidewalk counselors'] right[s]" protected by the First Amendment. *Hill*, 530 U.S. at 741-42 (Scalia, J., dissenting).[10]

---

[10] Plaintiffs acknowledge that if an otherwise directly applicable case "rest[s] on reasons rejected in some other line of decisions, Courts of Appeals should follow the case which directly controls, leaving to [the

Therefore, the County's criminalization of any "approach" to a person within eight feet "for the *purpose of* . . . engaging in oral protest, education, or counseling" without the person's affirmative consent expressly restricts speech based on its *substantive* "*purpose*" and so is blatantly content-based. *City of Austin*, 142 S. Ct. at 1472-73. This is especially true given legislators' overt concerns with prohibiting what they viewed as "Trojan Horse gifts" from sidewalk counselors and shielding people from the emotive impact of pro-life speech, which another legislator called the "maximum fury of the First Amendment." App.97 ¶¶120(b).[11] Accordingly, the Bubble Zone must undergo strict scrutiny.

### 2. The Bubble Zone fails both strict and intermediate scrutiny.

Strict scrutiny requires narrow tailoring in furtherance of a compelling interest. *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 799 (2011). "The curtailment of free speech must be *actually necessary* to the

---

Supreme] Court the prerogative of overruling [its] own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997). Notably, *Hill* is undermined not only by rejection of its reasoning in later decisions, but also by the Supreme Court's *obvious rejection of Hill itself*, thus illuminating the urgency of this appeal and the egregiousness of the harm the Bubble Zone is currently inflicting on Plaintiffs.

[11] Joint Meeting, *supra* n.4 (at 1:11:55).

solution." *Id.* Even intermediate scrutiny requires government to "show[] it seriously undertook to address the problem with less intrusive tools" and "that it considered different methods that other jurisdictions have found effective." *McCullen*, 573 U.S. at 494.

The Bubble Zone resoundingly flunks these tests. Indeed, it is expressly predicated on the legislators' finding that "current law does not adequately protect reproductive health care facilities," staff, and patients and that there is "a need for clear legislative boundaries" in connection with law enforcement. App.196. But the Legislation Committee cited only the trespass incident in November 2021, noted above. *Id.*; App.59-60 ¶¶2-3, 93 ¶107. It is manifestly true that restricting Plaintiffs from peacefully approaching others on the public right-of-way to distribute a leaflet and or counsel on abortion alternatives plainly "burden[s] substantially more speech than is necessary" to further the purported interest in preventing clinic trespasses, *McCullen*, 573 U.S. at 486 (internal quotes omitted), and is not "actually necessary to the solution," *Brown*, 564 U.S. at 799.

As to the County's asserted need for "clear legislative boundaries," App.196, the Supreme Court has rejected an eerily similar assertion in

a similar context, holding that "the prime objective of the First Amendment is not efficiency" for law enforcement in ensuring order outside of abortion facilities. *McCullen*, 573 U.S. at 495.

The Legislation Committee further claimed that "limited prosecutorial avenues are available under current law," noting that the County District Attorney did not invoke the New York State Clinic Access Act, N.Y. Penal L. § 240.70-.71, against the trespassers. App.196. Yet that is exactly the kind of law the Supreme Court stated is a less intrusive means of "combating deliberate obstruction of clinic entrances." *Id.* at 490-91.

As to the Committee's unsubstantiated claim that on the day in question "several protestors swarmed outside the facility, which disrupted access to the facility and diverted staff resources away from their patient care responsibilities," App.197, the preferential option of "targeted injunctions as alternatives to broad, prophylactic measures" would adequately restrict such conduct, not to mention "existing local ordinances" and "generic criminal statutes." *McCullen*, 573 U.S. at 492; *see* 18 U.S.C. 248(c)(1) (authorizing private causes of action to enjoin, among other things, physically obstructing access to reproductive

54

health facilities); N.Y.Penal Law § 140.10 (prohibiting unauthorized entrance onto the property of another on pain of criminal and civil penalties, including injunctions). Instead, the Bubble Zone "prohibit[s] a vast amount of speech that cannot possibly be thought to correspond to that evil." *Hill*, 530 U.S. at 755 (Scalia, J., dissenting).

While the remaining provisions of Chapter 425 are possibly also lesser restrictive means "in principle," *accord McCullen*, 573 U.S. at 491 n.8 and accompanying text, Plaintiffs disagree with the Plaintiff-Appellant in *Vitagliano* that § 425.31(a), (e), and (f) are actually substantially similar to the prohibitions of the FACE Act and N.Y. Penal Law § 240.70, *see* No. 23-30 Doc. 40 at 51, in part because § 425.21(h) defines "physically obstruct or block" to include a much broader array of activity than simply rendering clinic access "impassable" or "unreasonably difficult or hazardous," as the parallel term is defined in 18 U.S.C. § 248(d) and N.Y. Penal Law § 240.70(3)(d). Nor is Chapter 425's "follow and harass" provision an adequate less restrictive alternative, *cf.* No. 23-30 at 52, in part because "harass" is defined to include continued speech "after an … implied request to cease has been made." § 425.21(c); *see also McCullen*, 573 U.S. at 500

55

(Scalia, J., dissenting) ("It seems to me far from certain that First Amendment rights can be imperiled by threatening jail time (only at 'reproductive health care faclit[ies],' of course) for so vague an offense as "follow[ing] and harass[ing].") (alterations in original).

Indeed, given the County's express reliance on *Griepp*, its resulting "souped up," turbo-charged version of existing laws threatens to serve as "an erroneous application of F.A.C.E." that "impinges First Amendment Activity." *New York ex rel. Spitzer v. Operation Rescue Nat'l*, 273 F.3d 184, 195 (2d Cir. 2001); *see also Griepp*, 991 F.3d at 142 (Livingston, C.J., dissenting). Because this appeal is being considered "in tandem with" *Vitagliano*, Doc. 56, and these other provisions of Chapter 425 are not "unchallenged," *McCullen*, 573 U.S. at 490-91, this Court should not rely on them as anything more than *"in principle"* lesser restrictive means.

However, Plaintiffs do agree with the Plaintiff-Appellant in *Vitagliano* that the County's self-serving statement in this case that "there is no material difference between Chapter 425's prohibitions and definitions and the FACE's (or New York State law's) prohibitions and definitions," App.342, shows that it did not "seriously undert[ake] to

56

address the problem with less intrusive means." *McCullen*, 573 U.S. at 494. That is, from the County's perspective, the other restrictions of Chapter 425 are wholly gratuitous and not "actually necessary to the solution." *Brown*, 564 U.S. at 799.

Moreover, it is never a legitimate, let alone compelling, interest for the government to "prohibit the expression of an idea simply because society," or here, the County, "finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989).

Finally, the Bubble Zone also fails intermediate scrutiny because there is no evidence that these Plaintiffs or other pro-life sidewalk advocates have violated any law in connection with their speech. (Ex. 1 ¶109.) Most instructive on this point is *Schenck v. Pro-Choice Network of Western New York*, 519 U.S 357 (1997). There the Supreme Court, applying only intermediate scrutiny, upheld an *injunctive* (not statutory) 15-foot buffer-zone around clinic doors and driveways against *particular defendants* who had engaged in physical obstruction, but *reversed* the injunction's prohibition of the same defendants' *non-*obstructive leafletting and counselling. *Schenck*, 519 U.S. at 380-81. That distinction alone dooms the Bubble Zone's *prophylactic* content-

57

based restrictions on innocent parties under intermediate, let alone strict, scrutiny.

Therefore, the Bubble Zone cannot survive strict or intermediate scrutiny.

### B.    Irreparable Harm.

As noted, "[t]he loss of First Amendment freedoms . . . unquestionably constitutes irreparable injury." *Elrod*, 427 U.S. at 373. The bubble zone has "compromise[d] [Plaintiffs'] ability to initiate close, personal conversations that they view as essential to sidewalk counseling," and they can no longer effectively "offer literature as drivers turn into the parking lots." *McCullen*, 573 U.S. at 487-88. App.328 ¶¶12-15.) To avoid a criminalized "approach" under the law's hyper-technical definition of "eight feet" (§ 425.21(b)), Plaintiffs would have to stand still, arms rigidly outstretched offering literature, in hopes that a patient or vehicle passing within eight feet would engage them (§ 425.21(a)).    Thus Plaintiffs, to avoid fines and jail time, reasonably stand away from the driveway and street entrance at the subject locations. App.328 ¶14; App.88 ¶91(a)-(b).)

Finally, after the Supreme Court's October 2021 term, during which it declared that "we do not . . . resuscitate ["*Hill*"]," *City of Austin*, 142 S. Ct. at 1475 (quotations and alteration omitted), and that *Hill* was a "distort[ion] [of] First Amendment doctrines," *Dobbs*, 142 S. Ct. at 2276 and n.65, it cannot seriously be disputed that the Bubble Zone blatantly violates the First Amendment and is thus causing Plaintiffs' irreparable harm. And "irreparable harm is the single most important pre-requisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (cleaned up).

As Plaintiffs are clearly suffering irreparable harm to "vital First Amendment interests," *McCullen*, 573 U.S. at 498, they are in need of preliminary injunctive relief.

## C. Balance of Harms and Public Interest.

The balance of harms and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). It almost goes without saying that an injunction against enforcement of the Bubble Zone would allow Plaintiffs to resume approaching individuals and vehicles outside the clinics to distribute

pro-life leaflets and sidewalk counsel, while still allowing the County to protect clinic access and punish trespassers. And "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC*, 733 F.3d at 488.

## CONCLUSION

For the foregoing reasons, this Court has jurisdiction to decide this appeal. *Hill* should be overruled by the Supreme Court and the Bubble Zone enjoined under the clear requirements of the First Amendment as reaffirmed by the Supreme Court post-*Hill*.

Respectfully submitted,

/s/ Christopher Ferrara
CHRISTOPHER A. FERRARA, ESQ.
Special Counsel
THOMAS MORE SOCIETY
148-29 Cross Island Parkway
Whitestone, Queens, New York 11357
Telephone: (718) 357-1040
cferrara@thomasmoresociety.org
*Counsel for Plaintiffs-Appellants*

/s/ Michael McHale
MICHAEL G. MCHALE
Senior Counsel
THOMAS MORE SOCIETY
10506 Burt Circle, Ste. 110
Omaha, NE 68114
(402) 501-8586
mmchale@thomasmoresociety.org
*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.     This document complies with the type-volume limitation of Fed. R. App. P. 32(a) and Local Rule 32.1(a)(4) because, excluding the parts of the brief exempted by Fed. R. App. P. 32, this brief contains 11,953 words.

2.     This document complies with the typeface and typestyle requirements of Fed. R. App. P. 32(a)(5)-(7) because this document has been prepared using Microsoft Word in 14-point Century Schoolbook font.

/s/ Michael McHale

i

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Transcript of Pre-Motion Conference held before
the Honorable Philip M. Halpern, dated
January 18, 2023 ................................................... SPA-1

Order Denying Proposed Order Denying Injunctive
Relief as to 425.31(i), so-ordered
January 25, 2023 ................................................... SPA-25

SPA-1

1

```
 1  UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
 2
    ----------------------------------------x
 3  40 DAYS FOR LIFE, a nonprofit corporation
    of the State of Texas,
 4                                      22 CV 695(PMH)
    WHITE PLAINS 40 DAYS FOR LIFE, an       PRE-MOTION CONFERENCE
 5  unincorporated association of the
    State of New York,
 6
    OKSANA HULINSKY, and
 7
    REGINA JOY CREARY MOLINELLI (formerly
 8  suing as "Sally Roe"),
 9                       Plaintiffs,
10      -vs-
11  COUNTY OF WESTCHESTER,
12                       Defendant.
    ----------------------------------------x
13
                             United States Courthouse
14                           White Plains, New York
                             January 18, 2023
15
                    ** VIA TELECONFERENCE **
16
    Before, THE HONORABLE PHILIP M. HALPERN, District Judge
17
    A P P E A R A N C E S:
18
    THOMAS MORE SOCIETY
19       Attorneys for Plaintiffs
         148-29 Cross Island Parkway
20       Whitestone, New York 11357
    BY:  CHRISTOPHER A. FERRARA
21  --and--
    THOMAS MORE SOCIETY
22       10506 Burt Circle
         Suite 110
23       Omaha, Nebraska 68114
    BY:  MICHAEL McHALE
24
    *Proceedings recorded via digital recording device*
25
    A P P E A R A N C E S:  (CONT.)
```

SPA-2

2

```
 1
   ‖WESTCHESTER COUNTY ATTORNEY'S OFFICE
 2 ‖     Attorneys for Defendant
   ‖     148 Martine Avenue
 3 ‖     Room 600
   ‖     White Plains, New York 10601
 4 ‖BY:  JOHN NONNA
   ‖     SHAWNA C. MacLEOD
 5 ‖     ALIDA L. MARCOS
   ‖     JUSTIN R. ADIN
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**SPA-3**

011823                          Proceedings                          3

1           THE DEPUTY CLERK:  In the matter of Hulinsky against

2   the County of Westchester.

3           Would the plaintiffs please note your appearance?

4           MR. FERRARA:  Christopher A. Ferrara for the

5   plaintiffs.

6           MR. McHALE:  Michael G. McHale for the plaintiffs.

7           THE DEPUTY CLERK:  Defense counsel, please note your

8   appearance.

9           MR. NONNA:  John Nonna, Westchester County Attorney.

10          MS. MacLEOD:  Shawna MacLeod, Senior Assistant County

11  Attorney for the County of Westchester.

12          MS. MARCOS:  Alida Marcos.

13          MR. ADIN:  Justin Adin, Deputy County Attorney.

14          MS. MARCOS:  Alida Marcos, Assistant County Attorney.

15          THE COURT:  All right.  Counsel, good morning.

16          (All counsel respond)

17          THE COURT:  All right.  I want to be practical here

18  first and see if we can't try to get to the gravamen here.

19          Mr. Ferrara, I have this sense -- I may be wrong, and

20  you can correct me -- but my sense of this is you would like to

21  get past me and get to the Second Circuit so that you're in line

22  with the other case, *Vitagliano*, and can pressure issues there.

23  Am I right or wrong about that?

24          MR. FERRARA:  You're absolutely right, Your Honor.

25          THE COURT:  All right.  So that's a practical point,

SPA-4

011823                           Proceedings                           4

 1  right?

 2          MR. FERRARA:  Yes.

 3          THE COURT:  And I guess the other point that I want to

 4  make as a practical matter is, assuming I give you all due speed

 5  for your application, which I'm frankly not sure is necessary,

 6  but assuming I did that, you know, February 22nd is illusory.

 7  It's just simply illusory.  You've got, as I see it, two, four,

 8  six, eight separate attacks on this statute, although one, (i),

 9  425.31(i), I have already ruled on, and I am not going to give

10  you a different ruling in this case than I did in the *Vitagliano*

11  case.  So you really have seven broad-based attacks.  Okay.

12          Mr. Nonna, let me ask you a practical question.  If I

13  asked you to tell me one way or another, would you be willing,

14  during the pendency of this, to simply agree as a matter of

15  course -- as to these plaintiffs and these plaintiffs only --

16  simply to have a standstill agreement with respect to (a), (c),

17  (d), (e), (f), (g) and (h)?  In other words, nobody is doing

18  anything except saying, during the pendency of this action, the

19  County will not seek to enforce as to these plaintiffs those

20  separate provisions:  (a) and (c) through (g), (c) through (h);

21  meaning (b) and (i) would still be -- because (b) is not at

22  issue in this case, and (i) I have already ruled on; is there a

23  practical solution here that we can engage to save some time and

24  brief writing and whatnot?

25          MR. NONNA:  That's a very interesting question that I

SPA-5

011823                           Proceedings                           5

1 would like to -- that off the top of my head, this is how I

2 would address it, Judge, to be honest with you.  I think that

3 many of these provisions that they are attacking that prohibit

4 blocking and obstructing are all very similar to the FACE Act,

5 the federal act which -- whose constitutionality has been

6 upheld, and with our definition they make it very clear that

7 these provisions are not vague.

8          So the one that is -- that is a new issue in a sense,

9 and we do not dispute that it's -- that the *Griepp* case has been

10 overruled or been vacated, so it doesn't deal with the

11 constitutionality is (c).  I think the most we can agree to at

12 this point is, pending the resolution of their preliminary

13 injunction motion, we would agree to do a standstill on Section

14 (c), which is the knowingly follow and harass provision.

15 Because I think the others -- leaving aside (i), which you have

16 ruled upon, Your Honor has already ruled upon -- the others are

17 all very similar, if not the same as what's in the FACE Act, and

18 I don't think we can agree to standstill on not enforcing any

19 efforts to physically obstruct, block --

20          THE COURT:  Well, that's (b).  (B) is not at issue in

21 my case.  So (b) is not going to be the subject of any

22 application by the plaintiff because they have no challenge to

23 (b).

24          MR. NONNA:  Yes, but they are challenging (d), (e),

25 (e) -- (d), (e), (f) --

SPA-6

011823                          Proceedings                          6

 1            THE COURT:  (G) and (h).

 2            MR. NONNA:  (D), (e), (f), and (h), which I think are

 3    similar to what's in the FACE Act.

 4            THE COURT:  I see.

 5            MR. NONNA:  And therefore, I don't think we can agree

 6    to stand still on prohibiting that type of activity.

 7            But with respect to the follow and harass provision,

 8    (c), Rule 425.31(c), that is one that, you know, I think is a

 9    relatively novel issue.  It's not -- it's modeled after a New

10    York City law, which we agree was originally ruled

11    constitutional in *Griepp*, but that decision was vacated.  So

12    that's an open issue, and we would agree that that should -- we

13    would stand still on enforcing that provision.

14            THE COURT:  Yeah.  Okay.

15            Mr. Ferrara, how -- how is it -- I mean, you can't

16    have everything and get to the Second Circuit, you know?  And I

17    was thinking that because I -- my sense of this has been, you

18    really just want to -- you don't want somebody out ahead of you

19    on this issue in the Second Circuit.  And so I was trying to

20    think of a way to -- in other words, get you to that place

21    without so much as a big to-do.

22            One way, of course, would be for you to drop all of

23    these claims presently except (i), and I can tell you that the

24    ruling would be the same in your Section (i) theory that I have

25    already ruled upon.  If that doesn't work really, my concern

SPA-7

011823                        Proceedings                        7

1   would be there is no way for me to unleash you and get you to

2   the Second Circuit because I am happy to address the issues you

3   present but, you know, it's going to take some time and effort

4   at my end.  I don't even know if I need a hearing here.  I

5   haven't thought about that.

6          I do have some fundamental questions that I want to

7   talk about once we get through this piece, but is there any

8   wisdom for you in doing that?

9          MR. FERRARA:  I would say no, Your Honor, because of

10  the actual chilling effect that the other restrictions have, and

11  these definitions go well beyond existing statutes.  The

12  definition of "physically obstruct or block," the definition of

13  "interfere with," the definition of "any course of conduct," all

14  of these definitions are far more extensive in terms of what

15  they restrict than what you see in FACE.  For example, FACE

16  would prohibit rendering the premises impassible or making it

17  unreasonably difficult or hazardous to access the premises

18  whereas the definition here is any hindrance or impediment, and

19  also "interference" is defined as to delay or impede by

20  deceptive means or otherwise.

21         This is a complete novelty.  We don't see this in any

22  existing statute.  I don't know what they mean by "deceptive

23  means or otherwise."  And the effect of these provisions has

24  been that the clients, Ms. Molinelli, for example,

25  Mrs. Molinelli has ceased her activity entirely.  Mrs. Hulinsky

DARBY GINSBERG, RPR (914) 390-4102

SPA-8

011823                    Proceedings                    8

1  has remained across the street unless there is another pro-life
2  activist on the same side of the street as the clinic, but even
3  in that case she stays far away from the only place really where
4  there is effective advocacy, which is the doorway entrance on
5  the sidewalk.
6          So there's been actual chill because of these
7  provisions, and as they -- as the County counsel himself
8  observed, even if you observe the bubble zone restriction, and I
9  am quoting, "other provisions might kick in."  And that's the
10 way this statute was designed.  Even if you observe the bubble
11 zone, you are inside another zone, the 25-foot no-follow-and-
12 harass zone.  Interference embraces the entire area around the
13 clinic, and interference is very loosely defined.
14         So as an attorney advising clients on possible
15 exposure under this statute, I would have to say, stay away
16 until we can get this clarified and obtain appropriate
17 injunctive relief.  So I can't just drop the other claims.
18         MR. McHALE:  Your Honor, this is Michael McHale.  If I
19 can say something with -- for the plaintiffs.  Our research
20 shows -- and maybe correct us if we are wrong about this -- but
21 a denial of our motion for preliminary injunction in a piecemeal
22 fashion just on the bubble zone subdivision (i) we think would
23 be appealable while the rest of the motion plays itself out, and
24 then another option is just a kind of *sua sponte* dismissal, and
25 then under Civil Rule 54(b), it's possible to effectively

DARBY GINSBERG, RPR (914) 390-4102

**SPA-9**

1  certify that as final because it's a discrete issue, and then

2  that's another way we could take that issue up and join with

3  *Vitagliano*.  So those are two of our ideas given --

4          THE COURT:  Well, unfortunately, I am your judge or

5  fortunately, I am your judge.  I'm not your partner in crime

6  here.  So --

7          MR. McHALE:  Yes.

8          THE COURT:  -- I do not -- you know, I can be very

9  clear and maybe this will help you if you frame it to me

10 properly.  I am not going to change my mind on what I have

11 written on *Vitagliano*, period.  So if while this motion is

12 pending that would assist in getting you some procedural

13 position, I have no interest in getting in the way of it.  It's

14 frankly none of my concern.  I'm interested in only getting your

15 motion in and adjudicated.  But if that somehow helps, you know,

16 or something that I can easily do to get you into the Second

17 Circuit, so be it.  I don't think Mr. Nonna cares one way or the

18 other.

19          Am I right about that, Mr. Nonna?

20          MR. NONNA:  No, we don't care one way or the other.  I

21 mean, this is an internecine fight between two sets of

22 plaintiffs' counsel who want to get to the Supreme Court and get

23 credit for hopefully getting *Hill* overturned.  So we are not in

24 that fight.  You know, we are just trying to sustain our law.  I

25 won't address any of the merits that --

1              THE COURT:  No, I got.  All right.

2              (Cross-talk)

3              THE COURT:  If there is a way to engineer that, you

4    know, I will consider it.

5              I want to talk about 40, the Texas entity, for a

6    minute.  Why do we need them?  Why do they have standing?  How

7    do they fit into this scenario?

8              MR. FERRARA:  Your Honor, the cases we'll cite in the

9    brief will show that organizational standing arises when the

10   mission of an organization is affected by a statute that

11   restricts First Amendment activity, and the indicia of standing

12   would be that the organization has devoted resources to

13   challenging the statute, which is the case here; they have

14   diverted resources to the investigation of the statute, to

15   locating witnesses who can testify about the effects on the

16   local vigils, which are the way that this organization

17   accomplishes its mission.  So --

18             (Cross-talk)

19             THE COURT:  I mean, I am going to react for you.  Your

20   argument is well in line with what I anticipated it to be, but

21   it's very tentative, just so you know.

22             The other issue I have concerning -- and frankly,

23   40 Days for Life, you have other plaintiffs who clearly have

24   standing, so I don't know -- I don't know why we need to be

25   distracted by 40 Days for Life but, you know, I will deal with

SPA-11

1  it.

2        The other thing that is of concern to me is, you know,

3  this business about a credible threat.  I haven't -- I don't

4  recall -- I recall getting your TRO application, and somebody --

5  one of the plaintiffs indicating that they needed more training

6  or some such.  I don't recall which plaintiff it was, but talk

7  to me a little bit about credible threat here that the plaintiff

8  believes exists.

9        MR. FERRARA:  Our position is that this Chapter 425

10  was designed precisely with the *Griepp* decision in view.  In

11  fact, the follow and harass provision, which prohibits any

12  course of conduct, any act or conduct that continues after an

13  implied or express request to cease is taken directly from

14  *Griepp*.  In the *Griepp* case, the attorney general made maximal

15  demands on the application of the New York City version of FACE

16  such that the court concluded on appeal, reversing the District

17  Court, that even *de minimis* contact, *de minimis* interference, a

18  delay of either a second or two on the sidewalk triggered a

19  violation of the New York statute.

20        Now, the County claims it's basing its Chapter 425 on

21  the New York statute whose constitutionality is dubious at best.

22  So if you look at the *Griepp* decision, you will see that what we

23  have here is a situation involving numerous hair-trigger

24  provisions that are designed to keep protestors on the sidewalk

25  away from people approaching or leaving the clinic.

011823             Proceedings          12

1       If you look at the legislative history that we pleaded

2 in the complaint, there are numerous references to a gauntlet of

3 intimidation, the full fury of the First Amendment being

4 unacceptable to these legislators, and there is no fit between

5 this statute and the supposed justification for its enactment,

6 which was the trespass incident by the Red Rose Rescue movement.

7 This statute has nothing to do with trespassing.  It has

8 everything to do with limiting sidewalk advocacy with the same

9 effect as seen in the original appellate decision in *Griepp*, in

10 other words, a whole series of concentric standards for

11 regulating speech, which involves hair-

12 trigger liability.  So that's what we're claiming in this case.

13       There is a credible threat of enforcement if you look

14 at the way the New York statute was enforced in the *Griepp* case,

15 on which the legislators expressly relied repeatedly, and it's

16 just quoted almost verbatim in 425(i) -- 425.31(i).

17       THE COURT:  Yeah.  Okay.  Is there an instinct here,

18 Mr. Nonna, that we need a hearing on the factual disputes that I

19 need to resolve before I can get to the merits of the

20 preliminary injunction?

21       MR. NONNA:  We are thinking of the fact we may want a

22 hearing to present evidence that, in fact, protestors, after

23 this law has passed, have been appearing at reproductive health

24 facilities in Westchester and protesting and able to stand their

25 ground whilst people walk by and hold up signs and hand out

011823                     Proceedings                         13

1   leaflets as people walk by without approaching them.  They can

2   stand within any of these zones and hand out leaflets and hold

3   up signs and protest.

4            THE COURT:  All right.  Okay.  So with respect to the

5   plaintiffs' application, let me say a couple of things:  First

6   of all, I am a burden-of-proof person.  I have no interest in

7   the 90-page complaint that is a combination of your evidence and

8   your elements of the claims for relief.  That, to me, is just

9   distracting.  So please, when you're making your application,

10  stick to the burden of proof.  Stick to the elements of this

11  case, this claim, and give me your very best on the case law

12  associated with whatever it is you want me to focus on.  Okay?

13           I don't have an interest in wandering through,

14  tiptoeing through.  The page limitations are strict.  I'm not

15  changing them.  Work within the page limitations.  And once I

16  get everything, and I get it digested, I will figure out whether

17  and to what extent I need a hearing on the facts.  So that's one

18  issue.

19           If -- and I understand it to be that you -- defendant

20  has no objection, and the plaintiff has a proposal, an idea with

21  respect to the *Vitagliano* ruling that would be applicable here.

22  I'm certainly happy to look at whatever you suggest.  I'm not

23  committing to a course of conduct, but if, in fact, there is no

24  objection, and in that sense we are simply saying to one

25  another, Judge, what you did in *Vitagliano* you are going to do

SPA-14

1  here so would you please do it here now so that we can advance

2  the ball in the Second Circuit; if that's something I can do, I

3  certainly will look at it.  Okay?  But don't -- you know, let's

4  not make it a -- don't get distracted by that.

5          With respect to the affidavits, limit the affidavits

6  to that which I need to rule on.  Okay?  If there is a -- if

7  there is a credible threat, tell me about it.  If 40DFL has

8  standing here because I am assuming that in order for them to

9  have standing, they have to actually do something in White

10 Plains rather than just be a national organization that does

11 things nationally, so you will tell me about those things.

12         And I will get to this as quickly as I can.

13         So tell me, Mr. Ferrara, Mr. McHale, how much time do

14 you need to -- and I think what we will do is we will bundle

15 this motion, meaning you will file everything on the reply date.

16 How much time do you need to serve your motion?

17         MR. FERRARA:  I would say within a week we can file

18 our motion with the supporting brief.  In the terms of

19 affidavits, Your Honor, we believe that the verified complaint

20 provides the factual allegations that you need to determine the

21 motion.

22         THE COURT:  Okay.

23         MR. FERRARA:  So perhaps we will have a supplemental

24 affidavit.  I am not sure about that.

25         THE COURT:  Well, you do whatever you think is

011823                    Proceedings                    15

1  appropriate.  Of course --

2            MR. FERRARA:  Sure.

3            THE COURT:  -- I have to consider your complaint, and

4  I will.  My comment, though, is you know, a complaint and

5  evidence are two different things and serve two different

6  purposes, and jamming your evidence into a complaint doesn't

7  really help the cause, frankly.  All right.

8            So you are saying -- today is what, the 18th?  So you

9  can serve your motion by the 25th of January; is that it?

10           MR. FERRARA:  Michael, is that okay with you?

11           MR. McHALE:  Yup.  That's perfect.

12           THE COURT:  All right.  So you will serve your motion.

13           Mr. Nonna, how much time to oppose?

14           MR. NONNA:  Three weeks, please?

15           THE COURT:  The 25th.  That would be the 15th of

16  February to oppose.

17           And how much time to reply?

18           MR. FERRARA:  Oh, I would say a week, Michael?

19           MR. McHALE:  Can we say two weeks, and then we will

20  try to get it in a week?

21           MR. FERRARA:  Okay.

22           THE COURT:  Sure.  Of course.  March 1 to reply.

23           Now, what I would ask you to do is:  Serve your papers

24  on July -- July -- on January 25th.  Serve your opposition on

25  February 15th.  Serve your reply on March 1, and on March 1 file

SPA-16

011823                       Proceedings                        16

1  your motion papers and your reply papers, and file your

2  opposition, Mr. Nonna, on March 1.  That way, for me, the

3  statistical clock begins when, in fact, I can adjudicate the

4  motion and not on the day the first piece of paper is filed.

5  All right?

6          MR. FERRARA:  Your Honor, on the issue of 425.31(i),

7  could we submit to Your Honor a form of order that would suffice

8  for launching this on an appellate basis since no one is

9  objecting?

10         THE COURT:  Well, here is the thing, here is the

11 thing:  I have been around the block for more than 40 years or

12 so --

13         MR. FERRARA:  Me, too.

14         THE COURT:  -- of doing this.  You are creating a

15 novel issue for me in the sense that I don't want to be

16 criticized because I recognize your earnest desire to get into

17 the Second Circuit and beyond.  So you need to come up with a

18 pathway.  Mr. Nonna is indicating he has no objection to me

19 signing off on (i).  I just don't know -- I don't know how to

20 procedurally do that.  So if you can figure that out, you can

21 certainly, based on our conversation, submit a proposed order,

22 but you are going to have to give me a rationale that I can

23 actually do this.

24         MR. FERRARA:  Sure.  I think the simplest way would be

25 just to deny injunctive relief as to 425.31(i) because that's a

SPA-17

011823                    Proceedings                    17

1  partial denial, and our research has indicated that partial

2  denials of injunctive relief are appealable of right.

3          The other way you could do it would be under 54(b) and

4  just certify the issue; there being no reason to delay because

5  your decision on this is inevitable anyway, so there is no

6  reason to delay, so that meets the --

7          (Cross-talk)

8          THE COURT:  Well, there is a reason to delay, right,

9  under 54(b) because I haven't ruled on the other aspects of your

10 preliminary injunction.

11         MR. FERRARA:  Well, that's true, but it is a discrete

12 issue.  I think everyone agrees on that.  The bubble zone stands

13 alone as a novelty.

14         THE COURT:  Well, here is what I would urge.  I don't

15 know that -- hold on a second.  I am just looking at -- what did

16 you say to me, 54?

17         MR. FERRARA:  54(b).

18         MR. McHALE:  54(b).

19         MR. FERRARA:  Well, again, a partial denial of

20 injunctive relief would certainly be procedurally appropriate.

21         THE COURT:  Yeah, I mean, to me, that seems to be --

22 that seems to me to be something that's entirely reasonable at

23 my end, which is, I have indicated to you already that I am not

24 going to grant an injunction in this scenario because it's

25 exactly the same as the *Vitagliano*, and so that might be

SPA-18

1  something that you and Mr. Nonna can agree on consent; no

2  objection to the Court entering an order denying a preliminary

3  injunction for 425.31(i), and then you do whatever you need to

4  do with it.

5          I don't know the answer to the question:  A partial

6  denial of an injunction is appealable as of right.  I don't know

7  that.

8          MR. FERRARA:  Yeah, we believe it is.  I think that

9  makes the most sense probably.  I think Your Honor's misgivings

10 about 54(b) would indicate that we should go the other way.

11         THE COURT:  Yeah, I mean, I've had this certification

12 a couple of times, and it doesn't work out the way the lawyers

13 want it to.

14         MR. FERRARA:  Yeah.  We understand that.

15         THE COURT:  So I think the simplest thing on consent

16 would be nobody objects to me denying the motion.  Of course,

17 you object to the denial of the motion, but the procedural tenor

18 of doing that now so that you can do it -- take whatever

19 procedural step you need to take.  All right?

20         MR. FERRARA:  Yeah, I think that makes sense.

21         MR. NONNA:  Well, the denial be would the denial of a

22 preliminary injunction as to 421 point -- 425.31(i).

23         MR. FERRARA:  Yes.

24         THE COURT:  Yes.

25         MR. NONNA:  Got it.

011823                        Proceedings                        19

1           THE COURT:  Yes.  For the reasons set forth in the

2    *Vitagliano* decision.

3           MR. FERRARA:  Yeah, I think that makes perfect sense.

4           THE COURT:  Yes.  All right?  And then -- then if your

5    belief is you have a right to appeal that partial denial, so be

6    it.

7           MR. FERRARA:  Okay.

8           THE COURT:  All right?

9           MR. FERRARA:  We're fine with that.

10          THE COURT:  All right.  Terrific.

11          Anything else that I can do for anybody right now?

12          MR. FERRARA:  I guess not.

13          MR. McHALE:  Your Honor, one quick -- one quick

14   question?  When we serve the motion papers and the oppositions

15   and that, do you want courtesy copies at that time?

16          THE COURT:  Yes.  And just be -- heed my advice, I am

17   a burden-of-proof person.  That's how I think.  That's how I

18   judge.  That's how I adjudicate.  Stick to the burden of proof.

19   I don't need wild and, you know, broad-brushed statements.  Tell

20   me why you are entitled to an injunction in this case here with

21   these plaintiffs.  All right?

22          MR. FERRARA:  That's fine, Your Honor.

23          THE COURT:  All right.  Terrific.

24          MR. McHALE:  Thank you, Your Honor.

25          THE COURT:  I look forward to working with you.

SPA-20

011823                          Proceedings                              20

1          MR. McHALE:  Thank you, Your Honor.

2          MR. NONNA:  Thank you.

3                          -o0o-

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

SPA-21

**1**

**1** [4] - 15:22, 15:25, 16:2
**10506** [1] - 1:22
**10601** [1] - 2:3
**110** [1] - 1:22
**11357** [1] - 1:20
**148** [1] - 2:2
**148-29** [1] - 1:19
**15th** [2] - 15:15, 15:25
**18** [1] - 1:14
**18th** [1] - 15:8

**2**

**2023** [1] - 1:14
**22** [1] - 1:4
**22nd** [1] - 4:6
**25-foot** [1] - 8:11
**25th** [3] - 15:9, 15:15, 15:24

**4**

**40** [6] - 1:3, 1:4, 10:5, 10:23, 10:25, 16:11
**40DFL** [1] - 14:7
**421** [1] - 18:22
**425** [2] - 11:9, 11:20
**425(i** [1] - 12:16
**425.31(c** [1] - 6:8
**425.31(i** [4] - 4:9, 16:6, 16:25, 18:3
**425.31(i)** [2] - 12:16, 18:22

**5**

**54** [1] - 17:16
**54(b** [4] - 8:25, 17:3, 17:9, 18:10
**54(b)** [2] - 17:17, 17:18

**6**

**600** [1] - 2:3
**68114** [1] - 1:23
**695(PMH** [1] - 1:4

**9**

**90-page** [1] - 13:7

**A**

**able** [1] - 12:24
**absolutely** [1] - 3:24
**access** [1] - 7:17
**accomplishes** [1] -

10:17
**Act** [3] - 5:4, 5:17, 6:3
**act** [2] - 5:5, 11:12
**action** [1] - 4:18
**activist** [1] - 8:2
**activity** [3] - 6:6, 7:25, 10:11
**actual** [2] - 7:10, 8:6
**address** [3] - 5:2, 7:2, 9:25
**ADIN** [2] - 2:5, 3:13
**Adin** [1] - 3:13
**adjudicate** [2] - 16:3, 19:18
**adjudicated** [1] - 9:15
**advance** [1] - 14:1
**advice** [1] - 19:16
**advising** [1] - 8:14
**advocacy** [2] - 8:4, 12:8
**affected** [1] - 14:24
**affidavit** [1] - 14:24
**affidavits** [3] - 14:5, 14:19
**agree** [8] - 4:14, 5:11, 5:13, 5:18, 6:5, 6:10, 6:12, 18:1
**agreement** [1] - 4:16
**agrees** [1] - 17:12
**ahead** [1] - 6:18
**Alida** [2] - 3:12, 3:14
**ALIDA** [1] - 2:5
**allegations** [1] - 14:20
**almost** [1] - 12:16
**alone** [1] - 17:13
**Amendment** [2] - 10:11, 12:3
**answer** [1] - 18:5
**anticipated** [1] - 10:20
**anyway** [1] - 17:5
**appeal** [2] - 11:16, 19:5
**appealable** [3] - 8:23, 17:2, 18:6
**appearance** [2] - 3:3, 3:8
**appearing** [1] - 12:23
**appellate** [2] - 12:9, 16:8
**applicable** [1] - 13:21
**application** [6] - 4:5, 5:22, 11:4, 11:15, 13:5, 13:9
**approaching** [2] - 11:25, 13:1
**appropriate** [3] - 8:16, 15:1, 17:20
**area** [1] - 8:12
**argument** [1] - 10:20

**arises** [1] - 10:9
**aside** [1] - 5:15
**aspects** [1] - 17:9
**assist** [1] - 9:12
**Assistant** [2] - 3:10, 3:14
**associated** [1] - 13:12
**association** [1] - 1:5
**assuming** [3] - 4:4, 4:6, 14:8
**attacking** [1] - 5:3
**attacks** [2] - 4:8, 4:11
**attorney** [2] - 8:14, 11:14
**Attorney** [4] - 3:9, 3:11, 3:13, 3:14
**ATTORNEYS** [2] - 2:1
**Attorneys** [2] - 1:19, 2:2
**Avenue** [1] - 2:2

**B**

**b)** [2] - 5:20, 5:23
**ball** [1] - 14:2
**based** [2] - 4:11, 16:21
**basing** [1] - 11:20
**basis** [1] - 16:8
**begins** [1] - 16:3
**belief** [1] - 19:5
**believes** [1] - 11:8
**best** [2] - 11:21, 13:11
**between** [2] - 9:21, 12:4
**beyond** [2] - 7:11, 16:17
**big** [1] - 6:21
**bit** [1] - 11:7
**block** [3] - 5:19, 7:12, 16:11
**blocking** [1] - 5:4
**brief** [4] - 4:24, 10:9, 14:18
**broad** [2] - 4:11, 19:19
**broad-based** [1] - 4:11
**broad-brushed** [1] - 19:19
**brushed** [1] - 19:19
**bubble** [4] - 8:8, 8:10, 8:22, 17:12
**bundle** [1] - 14:14
**burden** [4] - 13:6, 13:10, 19:17, 19:18
**burden-of-proof** [2] - 13:6, 19:17
**Burt** [1] - 1:22
**business** [1] - 11:3
**BY** [3] - 1:20, 1:23, 2:4

**C**

**c)** [1] - 5:11
**care** [1] - 9:20
**cares** [1] - 9:17
**case** [14] - 3:22, 4:10, 4:11, 4:22, 5:9, 5:21, 8:3, 10:13, 11:14, 12:12, 12:14, 13:11, 19:20
**cases** [1] - 10:8
**cease** [1] - 11:13
**ceased** [1] - 7:25
**certainly** [4] - 13:22, 14:3, 16:21, 17:20
**certification** [1] - 18:11
**certify** [2] - 9:1, 17:4
**challenge** [1] - 5:22
**challenging** [2] - 5:24, 10:13
**change** [1] - 9:10
**changing** [1] - 13:15
**Chapter** [2] - 11:9, 11:20
**chill** [1] - 8:6
**chilling** [1] - 7:10
**CHRISTOPHER** [1] - 1:20
**Christopher** [1] - 3:4
**Circle** [1] - 1:22
**Circuit** [7] - 3:21, 6:16, 6:19, 7:2, 9:17, 14:2, 16:17
**cite** [1] - 10:8
**City** [2] - 6:10, 10:15
**Civil** [1] - 8:25
**claim** [1] - 13:11
**claiming** [1] - 12:12
**claims** [4] - 6:23, 8:17, 11:20, 13:8
**clarified** [1] - 8:16
**clear** [2] - 5:6, 9:9
**clearly** [1] - 10:23
**CLERK** [2] - 3:1, 3:7
**clients** [2] - 7:24, 8:14
**clinic** [3] - 8:2, 8:13, 11:25
**clock** [1] - 16:3
**combination** [1] - 13:7
**comment** [1] - 15:4
**committing** [1] - 13:23
**complaint** [6] - 12:2, 13:7, 14:19, 15:3, 15:4, 15:6
**complete** [1] - 7:21
**concentric** [1] - 12:10
**concern** [3] - 6:25, 9:14, 11:2

**concerning** [1] - 10:22
**concluded** [1] - 11:16
**conduct** [4] - 7:13, 11:12, 13:23
**CONFERENCE** [1] - 1:4
**consent** [2] - 18:1, 18:15
**consider** [2] - 10:4, 15:3
**constitutional** [1] - 6:11
**constitutionality** [3] - 5:5, 5:11, 11:21
**CONT** [1] - 1:25
**contact** [1] - 11:17
**continues** [1] - 11:12
**conversation** [1] - 16:21
**copies** [1] - 19:15
**corporation** [1] - 1:3
**correct** [2] - 3:20, 8:20
**counsel** [5] - 3:7, 3:15, 3:16, 8:7, 9:22
**COUNTY** [2] - 1:11, 2:1
**County** [9] - 3:2, 3:9, 3:10, 3:11, 3:13, 3:14, 4:19, 8:7, 11:20
**couple** [2] - 13:5, 18:12
**course** [8] - 4:15, 6:22, 7:13, 11:12, 13:23, 15:1, 15:22, 18:16
**Court** [3] - 9:22, 11:17, 18:2
**court** [1] - 11:16
**COURT** [37] - 1:1, 3:15, 3:17, 3:25, 4:3, 5:20, 6:1, 6:4, 6:14, 9:4, 9:8, 10:1, 10:3, 10:19, 12:17, 13:4, 14:22, 14:25, 15:3, 15:12, 15:15, 15:22, 16:10, 16:14, 17:8, 17:14, 17:21, 18:11, 18:15, 18:24, 19:1, 19:4, 19:8, 19:10, 19:16, 19:23, 19:25
**courtesy** [1] - 19:15
**Courthouse** [1] - 1:13
**CREARY** [1] - 1:7
**creating** [1] - 16:14
**credible** [4] - 11:3, 11:7, 12:13, 14:7
**credit** [1] - 9:23
**crime** [1] - 9:5
**criticized** [1] - 16:16

**Cross** [3] - 1:19, 10:2, 17:7
**cross** [1] - 10:18
**Cross-talk** [2] - 10:2, 17:7
**cross-talk** [1] - 10:18
**CV** [1] - 1:4

# D

**date** [1] - 14:15
**Days** [2] - 10:23, 10:25
**DAYS** [2] - 1:3, 1:4
**de** [2] - 11:17
**deal** [2] - 5:10, 10:25
**deceptive** [2] - 7:20, 7:22
**decision** [6] - 6:11, 11:10, 11:22, 12:9, 17:5, 19:2
**defendant** [1] - 13:19
**Defendant** [2] - 1:12, 2:2
**defense** [1] - 3:7
**defined** [2] - 7:19, 8:13
**definition** [5] - 5:6, 7:12, 7:13, 7:18
**definitions** [2] - 7:11, 7:14
**delay** [5] - 7:19, 11:18, 17:4, 17:6, 17:8
**demands** [1] - 11:15
**denial** [8] - 8:21, 17:1, 17:19, 18:6, 18:17, 18:21, 19:5
**denials** [1] - 17:2
**deny** [1] - 16:25
**denying** [2] - 18:2, 18:16
**DEPUTY** [2] - 3:1, 3:7
**Deputy** [1] - 3:13
**designed** [3] - 8:10, 11:10, 11:24
**desire** [1] - 16:16
**determine** [1] - 14:20
**device** [1] - 1:24
**devoted** [1] - 10:12
**different** [3] - 4:10, 15:5
**difficult** [1] - 7:17
**digested** [1] - 13:16
**digital** [1] - 1:24
**directly** [1] - 11:13
**discrete** [2] - 9:1, 17:11
**dismissal** [1] - 8:24
**dispute** [1] - 5:9
**disputes** [1] - 12:18
**distracted** [2] - 10:25,

14:4
**distracting** [1] - 13:9
**DISTRICT** [2] - 1:1, 1:1
**District** [2] - 1:16, 11:16
**diverted** [1] - 10:14
**doorway** [1] - 8:4
**drop** [2] - 6:22, 8:17
**dubious** [1] - 11:21
**due** [1] - 4:4
**during** [2] - 4:14, 4:18

# E

**earnest** [1] - 16:16
**easily** [1] - 9:16
**effect** [3] - 7:10, 7:23, 12:9
**effective** [1] - 8:4
**effectively** [1] - 8:25
**effects** [1] - 10:15
**effort** [1] - 7:3
**efforts** [1] - 5:19
**eight** [1] - 4:8
**either** [1] - 11:18
**elements** [2] - 13:8, 13:10
**embraces** [1] - 8:12
**enactment** [1] - 12:5
**end** [2] - 7:4, 17:23
**enforce** [1] - 4:19
**enforced** [1] - 12:14
**enforcement** [1] - 12:13
**enforcing** [2] - 5:18, 6:13
**engage** [1] - 4:23
**engineer** [1] - 10:3
**entering** [1] - 18:2
**entire** [1] - 8:12
**entirely** [2] - 7:25, 17:22
**entitled** [1] - 19:20
**entity** [1] - 10:5
**entrance** [1] - 8:4
**evidence** [4] - 12:22, 13:7, 15:5, 15:6
**exactly** [1] - 17:25
**example** [2] - 7:15, 7:24
**except** [2] - 4:18, 6:23
**existing** [2] - 7:11, 7:22
**exists** [1] - 11:8
**exposure** [1] - 8:15
**express** [1] - 11:13
**expressly** [1] - 12:15
**extensive** [1] - 7:14
**extent** [1] - 13:17

# F

**FACE** [6] - 5:4, 5:17, 6:3, 7:15, 11:15
**facilities** [1] - 12:24
**fact** [5] - 11:11, 12:21, 12:22, 13:23, 16:3
**facts** [1] - 13:17
**factual** [2] - 12:18, 14:20
**far** [2] - 7:14, 8:3
**fashion** [1] - 8:22
**February** [3] - 4:6, 15:16, 15:25
**federal** [1] - 5:5
**FERRARA** [28] - 1:20, 3:4, 3:24, 4:2, 7:9, 10:8, 11:9, 14:17, 14:23, 15:12, 15:10, 15:18, 15:21, 16:6, 16:13, 16:24, 17:11, 17:17, 17:19, 18:8, 18:14, 18:20, 18:23, 19:3, 19:7, 19:9, 19:12, 19:22
**Ferrara** [4] - 3:4, 3:19, 6:15, 14:13
**fight** [2] - 9:21, 9:24
**figure** [2] - 13:16, 16:20
**file** [4] - 14:15, 14:17, 15:25, 16:1
**filed** [1] - 16:4
**final** [1] - 9:1
**fine** [2] - 19:9, 19:22
**First** [2] - 10:11, 12:3
**first** [3] - 3:18, 13:5, 16:4
**fit** [2] - 10:7, 12:4
**focus** [1] - 13:12
**follow** [4] - 5:14, 6:7, 8:11, 11:11
**FOR** [2] - 1:3, 1:4
**form** [1] - 16:7
**formerly** [1] - 1:7
**forth** [1] - 19:1
**fortunately** [1] - 9:5
**forward** [1] - 19:25
**four** [1] - 4:7
**frame** [1] - 9:9
**frankly** [4] - 4:5, 9:14, 10:22, 15:7
**full** [1] - 12:3
**fundamental** [1] - 7:6
**fury** [1] - 12:3

# G

**gauntlet** [1] - 12:2
**general** [1] - 11:14

**given** [1] - 9:3
**grant** [1] - 17:24
**gravamen** [1] - 3:18
**Griepp** [8] - 5:9, 6:11, 11:10, 11:14, 11:22, 12:9, 12:14
**ground** [1] - 12:25
**guess** [4] - 4:3, 19:12

# H

**h)** [1] - 6:1
**hair** [1] - 11:23, 12:11
**hair-trigger** [1] - 11:23
**HALPERN** [1] - 1:16
**hand** [2] - 12:25, 13:2
**happy** [2] - 7:2, 13:22
**harass** [4] - 5:14, 6:7, 8:12, 11:11
**hazardous** [1] - 7:17
**head** [1] - 5:1
**health** [1] - 12:23
**hearing** [4] - 7:4, 12:18, 12:22, 13:17
**heed** [1] - 19:16
**help** [2] - 9:9, 15:7
**helps** [1] - 9:15
**Hill** [1] - 9:23
**himself** [1] - 8:7
**hindrance** [1] - 7:18
**history** [1] - 12:1
**hold** [3] - 12:25, 13:2, 17:15
**honest** [1] - 5:2
**Honor** [12] - 3:24, 5:16, 7:9, 8:18, 10:8, 14:19, 16:6, 16:7, 19:13, 19:22, 19:24, 20:1
**Honor's** [1] - 18:9
**HONORABLE** [1] - 1:16
**hopefully** [1] - 9:23
**HULINSKY** [1] - 1:6
**Hulinsky** [2] - 3:1, 7:25

# I

**i)** [1] - 16:19
**idea** [1] - 13:20
**ideas** [1] - 9:3
**illusory** [2] - 4:6, 4:7
**impassible** [1] - 7:16
**impede** [1] - 7:19
**impediment** [1] - 7:18
**implied** [1] - 11:13
**incident** [1] - 12:6
**indicate** [1] - 18:10
**indicated** [2] - 17:1,

17:23
**indicating** [2] - 11:5, 16:18
**indicia** [1] - 10:11
**inevitable** [1] - 17:5
**injunction** [9] - 5:13, 8:21, 12:20, 17:10, 17:24, 18:3, 18:6, 18:22, 19:20
**injunctive** [4] - 8:17, 16:25, 17:2, 17:20
**inside** [1] - 8:11
**instinct** [1] - 12:17
**interest** [3] - 9:13, 13:6, 13:13
**interested** [1] - 9:14
**interesting** [1] - 4:25
**interfere** [1] - 7:13
**interference** [4] - 7:19, 8:12, 8:13, 11:17
**internecine** [1] - 9:21
**intimidation** [1] - 12:3
**investigation** [1] - 10:14
**involves** [1] - 12:11
**involving** [1] - 11:23
**Island** [1] - 1:19
**issue** [14] - 4:22, 5:8, 5:20, 6:9, 6:12, 6:19, 9:1, 9:2, 10:22, 13:18, 16:6, 16:15, 17:4, 17:12
**issues** [2] - 3:22, 7:2
**itself** [1] - 8:23

# J

**jamming** [1] - 15:6
**January** [3] - 1:14, 15:9, 15:24
**JOHN** [1] - 2:4
**John** [1] - 3:9
**join** [1] - 9:2
**JOY** [1] - 1:7
**judge** [3] - 9:4, 9:5, 19:18
**Judge** [3] - 1:16, 5:2, 13:25
**July** [2] - 15:24
**justification** [1] - 12:5
**JUSTIN** [1] - 2:5
**Justin** [1] - 3:13

# K

**keep** [1] - 11:24
**kick** [1] - 8:9
**kind** [1] - 8:24
**knowingly** [1] - 5:14

3

## L

launching [1] - 16:8
law [4] - 6:10, 9:24, 12:23, 13:11
lawyers [1] - 18:12
leaflets [2] - 13:1, 13:2
leaving [2] - 5:15, 11:25
legislative [1] - 12:1
legislators [2] - 12:4, 12:15
liability [1] - 12:12
Life [2] - 10:23, 10:25
life [1] - 8:1
LIFE [2] - 1:3, 1:4
limit [1] - 14:5
limitations [2] - 13:14, 13:15
limiting [1] - 12:8
line [2] - 3:21, 10:20
local [1] - 10:16
locating [1] - 10:15
look [6] - 11:22, 12:1, 12:13, 13:22, 14:3, 19:25
looking [1] - 17:15
loosely [1] - 8:13

## M

MacLeod [3] - 2:4, 3:10
March [4] - 15:22, 15:25, 16:2
MARCOS [3] - 2:5, 3:12, 3:14
Marcos [2] - 3:12, 3:14
Martine [1] - 2:2
matter [3] - 3:1, 4:4, 4:14
maximal [1] - 11:14
McHale [13] - 1:23, 3:6, 8:18, 9:7, 14:13, 15:11, 15:19, 17:18, 19:13, 19:24, 20:1
mean [6] - 6:15, 7:22, 9:21, 10:19, 17:21, 18:11
meaning [2] - 4:21, 14:15
means [2] - 7:20, 7:23
meets [1] - 17:6
merits [2] - 9:25, 12:19
MICHAEL [1] - 1:23
Michael [4] - 3:6, 8:18, 15:10, 15:18
might [2] - 8:9, 17:25
mind [1] - 9:10

minimis [2] - 11:17
minute [1] - 10:6
misgivings [1] - 18:9
mission [2] - 10:10, 10:17
modeled [1] - 6:9
Molinelli [2] - 7:24, 7:25
MOLINELLI [1] - 1:7
MORE [2] - 1:18, 1:21
morning [1] - 3:15
most [2] - 5:11, 18:9
MOTION [1] - 1:4
motion [16] - 5:13, 8:21, 8:23, 9:11, 9:15, 14:15, 14:16, 14:18, 14:21, 15:9, 15:12, 16:1, 16:4, 18:16, 18:17, 19:14
movement [1] - 12:6
MR [48] - 3:4, 3:6, 3:9, 3:13, 3:24, 4:2, 4:25, 5:24, 6:2, 6:5, 7:9, 8:18, 9:7, 9:20, 10:8, 11:9, 12:21, 14:17, 14:23, 15:2, 15:10, 15:11, 15:14, 15:18, 15:19, 15:21, 16:6, 16:13, 16:24, 17:11, 17:17, 17:18, 17:19, 18:8, 18:14, 18:20, 18:21, 18:23, 18:25, 19:3, 19:7, 19:9, 19:12, 19:13, 19:22, 19:24, 20:1, 20:2
MS [3] - 3:10, 3:12, 3:14

## N

national [1] - 14:10
nationally [1] - 14:11
Nebraska [1] - 1:23
necessary [1] - 4:5
need [14] - 7:4, 10:6, 10:24, 12:18, 12:19, 13:17, 14:6, 14:14, 14:16, 14:20, 16:17, 18:3, 18:19, 19:19
needed [1] - 11:5
new [1] - 5:8
NEW [1] - 1:1
New [9] - 1:5, 1:14, 1:20, 2:3, 6:9, 11:15, 11:19, 11:21, 12:14
no-follow-and [1] - 8:11
nobody [2] - 4:17, 18:16
none [1] - 9:14

NONNA [2] - 2:4, 3:9, 4:25, 5:24, 6:2, 6:5, 9:20, 12:21, 15:14, 18:21, 18:25, 20:2
Nonna [9] - 3:9, 4:12, 9:17, 9:19, 12:18, 15:13, 16:2, 16:18, 18:1
nonprofit [1] - 1:3
note [2] - 3:3, 3:7
nothing [1] - 12:7
novel [2] - 6:9, 16:15
novelty [2] - 7:21, 17:13
numerous [2] - 11:23, 12:2

## O

object [1] - 18:17
objecting [1] - 16:9
objection [4] - 13:20, 13:24, 16:18, 18:2
objects [1] - 18:16
observe [2] - 8:8, 8:10
observed [1] - 8:8
obstruct [2] - 5:19, 7:12
obstructing [1] - 5:4
obtain [1] - 8:16
OF [2] - 1:1, 1:11
OFFICE [1] - 2:1
OKSANA [1] - 1:6
Omaha [1] - 1:23
once [2] - 7:7, 13:15
one [12] - 4:8, 4:13, 5:8, 6:8, 9:17, 9:20, 11:5, 13:17, 13:24, 16:8, 19:13
One [1] - 6:22
open [1] - 6:12
oppose [2] - 15:13, 15:16
opposition [2] - 15:24, 16:2
oppositions [1] - 19:14
option [1] - 8:24
order [4] - 14:8, 16:7, 16:21, 18:2
organization [4] - 10:10, 10:12, 10:16, 14:10
organizational [1] - 10:9
original [1] - 12:9
originally [1] - 6:10
otherwise [2] - 7:20, 7:23
overruled [1] - 5:10

overturned [1] - 9:23

## P

page [2] - 13:14, 13:15
paper [1] - 16:4
papers [4] - 15:23, 16:1, 19:14
Parkway [1] - 1:19
partial [5] - 17:1, 17:19, 18:5, 19:5
partner [1] - 9:5
passed [1] - 12:23
past [1] - 3:21
pathway [1] - 16:18
pendency [2] - 4:14, 4:18
pending [2] - 5:12, 9:12
people [3] - 11:25, 12:25, 13:1
perfect [2] - 15:11, 19:3
perhaps [1] - 14:23
period [1] - 9:11
person [2] - 13:6, 19:17
PHILIP [1] - 1:16
physically [2] - 5:19, 7:12
piece [2] - 7:7, 16:4
piecemeal [1] - 8:21
place [2] - 6:20, 8:3
Plains [3] - 1:14, 2:3, 14:10
plaintiff [4] - 5:22, 11:6, 11:7, 13:20
plaintiffs [10] - 3:3, 3:5, 3:6, 4:15, 4:19, 8:19, 10:23, 11:5, 19:21
Plaintiffs [2] - 1:9, 1:19
plaintiffs' [2] - 9:22, 13:5
plays [1] - 8:23
pleaded [1] - 12:1
point [4] - 3:25, 4:3, 5:12, 18:22
position [2] - 9:13, 11:9
possible [2] - 8:14, 8:25
practical [5] - 3:17, 3:25, 4:4, 4:12, 4:23
PRE [1] - 1:4
PRE-MOTION [1] - 1:4
precisely [1] - 11:10
preliminary [6] - 5:12,

8:21, 12:20, 17:10, 18:2, 18:22
premises [2] - 7:16, 7:17
present [2] - 7:3, 12:22
presently [1] - 6:23
pressure [1] - 3:22
pro [1] - 8:1
pro-life [1] - 8:1
procedural [2] - 9:12, 18:17, 18:19
procedurally [2] - 16:20, 17:20
Proceedings [1] - 1:24
prohibit [2] - 5:3, 7:16
prohibiting [1] - 6:6
prohibits [1] - 11:11
proof [4] - 13:6, 13:10, 19:17, 19:18
properly [1] - 9:10
proposal [1] - 13:20
proposed [1] - 16:21
protest [1] - 13:3
protesting [1] - 12:24
protestors [2] - 11:24, 12:22
provides [1] - 14:20
provision [4] - 5:14, 6:7, 6:13, 11:11
provisions [7] - 4:20, 5:3, 5:7, 7:23, 8:7, 8:9, 11:24
purposes [1] - 15:6

## Q

questions [1] - 7:6
quick [2] - 19:13
quickly [1] - 14:12
quoted [1] - 12:16
quoting [1] - 8:9

## R

rather [1] - 14:10
rationale [1] - 16:22
react [1] - 10:19
really [5] - 4:11, 6:18, 6:25, 8:3, 15:7
reason [3] - 17:4, 17:6, 17:8
reasonable [1] - 17:22
reasons [1] - 19:1
recognize [1] - 16:16
recorded [1] - 1:24
recording [1] - 1:24
Red [1] - 12:6
references [1] - 12:2

**REGINA**[1] - 1:7
**regulating**[1] - 12:11
**relatively**[1] - 6:9
**relied**[1] - 12:15
**relief** [5] - 8:17, 13:8, 16:25, 17:2, 17:20
**remained**[1] - 8:1
**rendering**[1] - 7:16
**repeatedly**[1] - 12:15
**reply** [5] - 14:15, 15:17, 15:22, 15:25, 16:1
**reproductive**[1] - 12:23
**request**[1] - 11:13
**Rescue**[1] - 12:6
**research** [2] - 8:19, 17:1
**resolution**[1] - 5:12
**resolve**[1] - 12:19
**resources** [2] - 10:12, 10:14
**respect** [5] - 4:16, 6:7, 13:4, 13:21, 14:5
**respond**[1] - 3:16
**rest**[1] - 8:23
**restrict**[1] - 7:15
**restriction**[1] - 8:8
**restrictions**[1] - 7:10
**restricts**[1] - 10:11
**reversing**[1] - 11:16
**Roe**[1] - 1:8
**Room**[1] - 2:3
**Rose**[1] - 12:6
**Rule** [2] - 6:8, 8:25
**rule**[1] - 14:6
**ruled** [7] - 4:9, 4:22, 5:16, 6:10, 6:25, 17:9
**ruling** [3] - 4:10, 6:24, 13:21

**S**

**Sally**[1] - 1:8
**save**[1] - 4:23
**scenario** [2] - 10:7, 17:24
**second** [2] - 11:18, 17:15
**Second** [7] - 3:21, 6:16, 6:19, 7:2, 9:16, 14:2, 16:17
**Section** [2] - 5:13, 6:24
**see** [6] - 3:18, 4:7, 6:4, 7:15, 7:21, 11:22
**seek**[1] - 4:19
**Senior**[1] - 3:10
**sense** [9] - 3:19, 3:20,

5:8, 6:17, 13:24, 16:15, 18:9, 18:20, 19:3
**separate** [2] - 4:8, 4:20
**series**[1] - 12:10
**serve** [8] - 14:16, 15:5, 15:9, 15:12, 15:23, 15:24, 15:25, 19:14
**set**[1] - 19:1
**sets**[1] - 9:21
**seven**[1] - 4:11
**SHAWNA**[1] - 2:4
**Shawna**[1] - 3:10
**show**[1] - 10:9
**shows**[1] - 8:20
**side**[1] - 8:2
**sidewalk** [4] - 8:5, 11:18, 11:24, 12:8
**signing**[1] - 16:19
**signs** [2] - 12:25, 13:3
**similar** [3] - 5:4, 5:17, 6:3
**simplest** [2] - 16:24, 18:15
**simply** [4] - 4:7, 4:14, 4:16, 13:24
**situation**[1] - 11:23
**six**[1] - 4:8
**SOCIETY** [2] - 1:18, 1:21
**solution**[1] - 4:23
**SOUTHERN**[1] - 1:1
**speech**[1] - 12:11
**speed**[1] - 4:4
**sponte**[1] - 8:24
**stand** [4] - 6:6, 6:13, 12:24, 13:2
**standards**[1] - 12:10
**standing** [6] - 10:6, 10:9, 10:11, 10:24, 14:8, 14:9
**stands**[1] - 17:12
**standstill** [3] - 4:16, 5:13, 5:18
**State** [2] - 1:3, 1:5
**statements**[1] - 19:19
**STATES**[1] - 1:1
**States**[1] - 1:13
**statistical**[1] - 16:3
**statute** [12] - 4:8, 7:22, 8:10, 8:15, 10:10, 10:13, 10:14, 11:19, 11:21, 12:5, 12:7, 12:14
**statutes**[1] - 7:11
**stay**[1] - 8:15
**stays**[1] - 8:3
**step**[1] - 18:19

**stick** [3] - 13:10, 19:18
**still** [3] - 4:21, 6:6, 6:13
**street** [2] - 8:1, 8:2
**strict**[1] - 13:14
**sua**[1] - 8:24
**subdivision**[1] - 8:22
**subject**[1] - 5:21
**submit** [2] - 16:7, 16:21
**suffice**[1] - 16:7
**suggest**[1] - 13:22
**suing**[1] - 1:8
**Suite**[1] - 1:22
**supplemental**[1] - 14:23
**supporting**[1] - 14:18
**supposed**[1] - 12:5
**Supreme**[1] - 9:22
**sustain**[1] - 9:24

**T**

**TELECONFERENCE**
[1] - 1:15
**tenor**[1] - 18:17
**tentative**[1] - 10:21
**terms** [2] - 7:14, 14:18
**terrific** [2] - 19:10, 19:23
**testify**[1] - 10:15
**Texas** [2] - 1:3, 10:5
**THE** [39] - 1:16, 3:1, 3:7, 3:15, 3:17, 3:25, 4:3, 5:20, 6:1, 6:4, 6:14, 9:4, 9:8, 10:1, 10:3, 10:19, 12:17, 13:4, 14:22, 14:25, 15:3, 15:12, 15:15, 15:22, 16:10, 16:14, 17:8, 17:14, 17:21, 18:11, 18:15, 18:24, 19:1, 19:4, 19:8, 19:10, 19:16, 19:23, 19:25
**theory**[1] - 6:24
**therefore**[1] - 6:5
**thinking** [2] - 6:17, 12:21
**THOMAS** [2] - 1:18, 1:21
**threat** [4] - 11:3, 11:7, 12:13, 14:7
**three**[1] - 15:14
**tiptoeing**[1] - 13:14
**to-do**[1] - 6:21
**today**[1] - 15:8
**top**[1] - 5:1
**training**[1] - 11:5
**trespass**[1] - 12:6

**trespassing**[1] - 12:7
**trigger** [2] - 11:23, 12:12
**triggered**[1] - 11:18
**TRO**[1] - 11:4
**true**[1] - 17:11
**try** [2] - 3:18, 15:20
**trying** [2] - 6:19, 9:24
**two** [7] - 4:7, 9:3, 9:21, 11:18, 15:5, 15:19
**type**[1] - 6:6

**U**

**unacceptable**[1] - 12:4
**under** [4] - 8:15, 8:25, 17:3, 17:9
**unfortunately**[1] - 9:4
**unincorporated**[1] - 1:5
**UNITED**[1] - 1:1
**United**[1] - 1:13
**unleash**[1] - 7:1
**unless**[1] - 8:1
**unreasonably**[1] - 7:17
**up** [4] - 9:2, 12:25, 13:3, 16:17
**upheld**[1] - 5:6
**urge**[1] - 17:14

**V**

**vacated** [2] - 5:10, 6:11
**vague**[1] - 5:7
**verbatim**[1] - 12:16
**verified**[1] - 14:19
**version**[1] - 11:15
**via**[1] - 1:24
**VIA**[1] - 1:15
**view**[1] - 11:10
**vigils**[1] - 10:16
**violation**[1] - 11:19
**Vitagliano** [8] - 3:22, 4:10, 9:3, 9:11, 13:21, 13:25, 17:25, 19:2
**vs**[1] - 1:10

**W**

**walk** [2] - 12:25, 13:1
**wandering**[1] - 13:13
**week** [3] - 14:17, 15:18, 15:20
**weeks** [2] - 15:14, 15:19
**Westchester** [4] - 3:2,

3:9, 3:11, 12:24
**WESTCHESTER** [2] - 1:11, 2:1
**whatnot**[1] - 4:24
**whereas**[1] - 7:18
**whilst**[1] - 12:25
**WHITE**[1] - 1:4
**White** [3] - 1:14, 2:3, 14:9
**Whitestone**[1] - 1:20
**whole**[1] - 12:10
**wild**[1] - 19:19
**willing**[1] - 4:13
**wisdom**[1] - 7:8
**witnesses**[1] - 10:15
**words** [3] - 4:17, 6:20, 12:10
**writing**[1] - 4:24
**written**[1] - 9:11

**Y**

**years**[1] - 16:11
**YORK**[1] - 1:1
**York** [9] - 1:5, 1:14, 1:20, 2:3, 6:10, 11:15, 11:19, 11:21, 12:14
**yup**[1] - 15:11

**Z**

**zone** [6] - 8:8, 8:11, 8:12, 8:22, 17:12
**zones**[1] - 13:2

SPA-25



**Thomas More SOCIETY**

A national public i

January

Application denied.

The Court finds no basis in law to bifurcate the motion for preliminary injunction as Plaintiffs request. The Court will consider Plaintiffs' request for preliminary injunctive relief as to all of the challenged provisions of Section 425.31 once the motion is sub judice.

**SO ORDERED.**

Philip M. Halpern
United States District Judge

Dated:  White Plains, New York
         January 25, 2023

Hon. Philip M. Halpern, U.S.D.J.
U.S. District Court for the Southern District of New
Hon. Charles L. Brieant Jr.
Federal Building and U.S. Courthouse
300 Quarropas St., Room 530
White Plains, NY 10601

Re: *40 Days for Life v. County of Westchester*, 7:22-cv-06950 (PMH)
    *Rel. Vitagliano v. County of Westchester*, 7:22-cv-09370 (PMH)

Dear Judge Halpern:

     Further to the colloquy with the Court yesterday at the pre-motion conference, I am submitting herewith a proposed form of order denying injunctive relief as to § 425.31(i) of the Laws of Westchester County, the so-called 8-foot "bubble zone" provision. Per County Counsel John Nonna's representation yesterday, confirmed in a telephone conversation with him today, the County has no objection to the entry of such an order.

                             Respectfully submitted,

                             s/Christopher A. Ferrara
                             Christopher A. Ferrara
                             Special Counsel – Thomas More Society
                             148-29 Cross Island Parkway
                             Whitestone, Queens, New York 11357
                             Telephone: 718-357-1040
                             cferrara@thomasmoresociety.org
                             *Counsel for Plaintiffs*

                             MICHAEL G. MCHALE, ESQ.*
                             Counsel
                             THOMAS MORE SOCIETY
                             10506 Burt Circle, Ste. 110
                             Omaha, NE 68114
                             Telephone: 402-501-8586
                             mmchale@thomasmoresociety.org
                             *Counsel for Plaintiffs* (pro hac vice)

c: Counsel for Westchester County (by ECF)

309 W. Washington Street | Suite 1250 | Chicago, IL 60606 | P: 312.782.1680 | thomasmoresociety.org
*"Injustice anywhere is a threat to justice everywhere."* - Dr. Martin Luther King